879 P.2d 1037

**Harvey J. ROSS, Plaintiff–Appellant,**

v.

**STOUFFER HOTEL COMPANY (HA-WAI'I) LTD., INC., d/b/a Stouffer Waiohai Resort; Glenn Perry, in his official capacity as General Manager of Stouffer Waiohai Resort; Carol Furtado, in her official capacity as Director of Personnel of Stouffer Waiohai Resort, Defendants–Appellees and John Does 1–10; Jane Does 1–10; Doe Business Entities 1–10; Doe Corporations 1–10; and Doe Partnerships 1–10, Defendants.**

No. 16486.

Supreme Court of Hawai'i.

Aug. 30, 1994.

William Tagupa (Elizabeth Jubin Fujiwara and Ronald T. Fujiwara with him, on the briefs), Honolulu, for plaintiff-appellant.

Perry W. Confalone (Robert S. Katz with him on the brief; Torkildson, Katz, Jossem, Fonseca, Jaffe, Moore & Hetherington), Honolulu, for defendants-appellees.

John Ishihara, on the brief, Honolulu, for amicus curiae Hawai'i Civil Rights Com'n.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

NAKAYAMA, Justice.

Plaintiff-appellant Harvey J. Ross filed an action against defendant-appellee Stouffer Hotel Company (Hawai'i) Ltd. (Stouffer)[1] in the Circuit Court of the Fifth Circuit, State of Hawai'i, after Stouffer discharged him from his position as a massage therapist at the Waiohai Resort (the Resort), on the island of Kaua'i, because of his marital status. At the time he was discharged, Ross was married to Viviana Treffry, who was the principal massage therapist at the Resort. Stouffer discharged Ross pursuant to its policy prohibiting persons related by blood or marriage from working in the same department (the no-relatives policy). The primary claim of Ross's complaint (and later his amended complaint) was that Stouffer's enforcement of its no-relatives policy violated Hawai'i Revised Statutes (HRS) § 378–2 (1985).[2] Following a series of procedural

---

1. As used herein, Stouffer refers to defendants-appellees Stouffer Hotel Company (Hawai'i) Ltd., Glenn Perry, general manager of the Resort, and Carol Furtado, director of personnel.

2. HRS § 378–2 (1985) provided in pertinent part:

**Discriminatory practices made unlawful; offenses defined.** It shall be an unlawful discriminatory practice:

skirmishes and two prior appeals to this court, the circuit court granted summary judgment in favor of Stouffer on six of the seven claims included in Ross's amended complaint and entered final judgment on those claims pursuant to Hawai'i Rules of Civil Procedure (HRCP) 54(b) (1991). Ross filed a timely appeal. For the following reasons, the summary judgment is affirmed in part and vacated in part.

## I.  BACKGROUND

In August 1986, Amfac Hotels and Resorts, Inc. (Amfac Hotels) hired Ross as a massage therapist at the Resort, which it then owned and operated. Amfac Hotels also hired Treffry, with whom Ross had been living for almost a year, as the principal massage therapist. Both worked in the Resort's Po'ipu Beach Fitness Center.

In August 1987, Ross and Treffry married. A couple of weeks later, Stouffer acquired the Resort from Amfac Hotels and became Ross's and Treffry's employer.

At the end of September 1987, Ross and Treffry became aware of Stouffer's no-relatives policy. In early October 1987, Ross and Treffry met with Perry and Furtado. At that meeting, the no-relatives policy was discussed, and Perry and Furtado agreed to talk to Stouffer's corporate headquarters about whether the policy would be enforced. Stouffer decided to enforce the policy.

On October 16, 1987, Perry sent a memo to Ross and Treffry, which stated in part:

In our meeting on October 9, 1987 we discussed the memo you had received relating to the employment of immediate family in the same department. We have taken your comments into consideration, discussed the situation and our decision is to enforce consistent application of our policy. This means that one of you will need to either apply for a transfer to another department or resign.

Because we understand that your specialty as massage therapists may make a transition to another position more complicat-

ed[,] we will allow an additional 60 days from today for you to decide which avenue will offer the best opportunities. An application for transfer will be based on qualifications for the position. In the event that you are unable to decide which one of you will transfer or resign, management will be obligated to terminate the employment of the less senior employee[;] in this case this would be Harvey.

Ross received the memo on October 20, 1987. Because neither he nor Treffry had transferred or resigned by the December 15, 1987 deadline, Ross was discharged.

On March 14, 1988, Ross filed a complaint with the enforcement division of the Department of Labor and Industrial Relations (DLIR), asserting that he had "been discriminated against on the basis of [his] marital status." He received a notice of right-to-sue from the DLIR about two weeks later. Ross filed a complaint in the circuit court on May 17, 1988, asserting claims for: wrongful discharge in violation of HRS § 378–2 (count I); discharge in violation of public policy (count II); intentional or negligent infliction of emotional distress (counts III and IV); and punitive damages (count V). Ross's complaint was later amended to include a federal claim under 42 U.S.C. § 1983 (count VI) and a claim for breach of implied contract (count VII). The case was eventually admitted to the Court Annexed Arbitration Program, where it was pending when the motions for summary judgment that are the subject of this appeal were made.

Following the addition of the federal statutory claim (count VI), the case was removed to the United States District Court for the District of Hawai'i. The federal district court dismissed the federal claim and remanded the case to the circuit court for adjudication of the remaining state claims. *Ross v. Stouffer Hotel Co. (Hawai'i) Ltd.*, No. 89–00049 (D.Haw. April 21, 1989) (order granting judgment on pleadings on federal cause of action and remanding to circuit court).

In July 1989, following the remand from the federal district court, the circuit court

(1) For any employer to ... discharge from employment ... any individual ... because of

... marital status[.]

filed an order granting Stouffer's motion for summary judgment on "each remaining count" of Ross's amended complaint. Ross appealed to this court. On September 21, 1990, we dismissed the appeal for lack of jurisdiction because, although the order granting summary judgment indicated that it applied to "each remaining count," it failed to expressly dismiss several of the counts in Ross's amended complaint. We therefore ruled that it was not an appealable final order.

On October 29, 1990, the circuit court entered an amended order granting summary judgment in favor of Stouffer on all remaining claims. Ross again appealed to this court. On August 29, 1991, we issued an opinion addressing only count I, *Ross v. Stouffer Hotel Company (Hawai'i) Ltd., Inc.,* 72 Haw. 350, 816 P.2d 302, *reconsideration denied,* 72 Haw. 616, 841 P.2d 1074 (1991) (*Ross I*). *Ross I* held that, unless it fit into one of the exceptions in HRS § 378-3 (1985),[3] Stouffer's discharge of Ross pursuant to its no-relatives policy violated HRS § 378-2, because it discriminated against Ross because of his marital status. 72 Haw. at 355, 816 P.2d at 304. Finding the record incomplete as to whether any of the exceptions in HRS § 378-3 applied, this court vacated the judgment and remanded the case to the circuit court for further proceedings consistent with the opinion. *Id.*

Following remand, Stouffer moved for partial summary judgment on counts II through VII, primarily arguing that the claims included in those counts were either barred or factually unsupported. On June 4, 1992, the circuit court entered an order granting Stouffer's motion as to counts II through VI

and denying the motion as to count VII (breach of implied contract).[4]

About a month later, Stouffer moved for summary judgment on count I, the HRS § 378-2 claim, and to strike certain damages claims. Stouffer primarily argued that Ross was barred from bringing count I because he did not timely file his complaint with the DLIR. Stouffer also argued that Ross's claims for compensatory and punitive damages under count I should be stricken because neither were available remedies under HRS § 378-5 (1985).

On August 27, 1992, the circuit court filed an order granting the motion and, finding that there was no just reason for delay, entered final judgment in Stouffer's favor on counts I through VI, pursuant to HRCP 54(b). (The breach of implied contract claim, count VII, remains.) Ross filed a timely appeal.

## II. *STANDARD OF REVIEW*

Review of an award of summary judgment is under the same standard applied by the circuit court and is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *S. Utsunomiya Enterprises, Inc. v. Moomuku Country Club,* 75 Haw. 480, 497, 866 P.2d 951, 961, *reconsideration denied,* 76 Hawai'i 247, 871 P.2d 795 (1994).

## III. *DISCUSSION*

### A. *Count I*

#### 1. *Reconsideration of Ross I*

■ Stouffer initially asks us to reconsider and overrule the majority's decision in *Ross I*

---

3. Among other things, HRS § 378-3 (1985) provided that nothing in Part I of HRS Chapter 378 prevented an employer from establishing bona fide occupational qualifications or discharging an employee for reasons related to his or her ability to perform a given job.

4. It is unclear why Stouffer moved for summary judgment on count VI, because that count was dismissed with prejudice by the federal district court. *See supra* at 456, 879 P.2d at 1039. Stouffer (and Ross) apparently believed that count VI, in addition to the federal statutory claim, also asserted a claim under the Hawai'i Constitution, which survived the federal district

court's dismissal of count VI. In any event, following remand from the federal district court, the circuit court specifically dismissed and entered final judgment in Stouffer's favor on count VI. Because Ross has not assigned the dismissal of count VI as a point of error on appeal and has completely failed to mention that claim in either his opening or reply briefs, we hold that he has waived any argument that count VI was improperly dismissed. Hawai'i Rules of Appellate Procedure (HRAP) 28(b)(4) and 28(b)(7) (1993); *see Azer v. Courthouse Racquetball Corp.,* 9 Haw.App. 530, 539 n. 10, 852 P.2d 75, 81 n. 10, *reconsideration denied,* —— Haw.App. ——, 857 P.2d 600 (1993).

458

because, it argues, that decision was based on incorrect facts and analysis.

Stouffer reiterates an argument it previously made in its motion to reconsider *Ross I*. It points out that the majority's opinion in *Ross I* incorrectly stated that Ross and Treffry were married in August 1986, over a year before Stouffer decided to enforce its no-relatives policy. 72 Haw. at 351, 816 P.2d at 303. In fact, the two were married in August 1987, approximately two months before Stouffer informed Ross and Treffry of its decision to enforce the policy. Based on this mistake, the majority stated:

> [I]nvocation of the policy a year after [Ross and Treffry] had entered into a marital relationship left them with a Hobson's choice of one of them either giving up his or her employment, or their seeking a divorce, and continuing to live together and being employed in their chosen occupation.

*Id.* at 354, 816 P.2d at 304. Although regrettable, the error affected neither the analysis nor the result of *Ross I*, as this court indicated when we denied Stouffer's motion for reconsideration. 72 Haw. 616, 841 P.2d 1074. In *Ross I*, the majority concluded that, by enforcing its no-relatives policy, Stouffer violated HRS § 378–2(1), because it discharged Ross "because of ... [his] marital status." 72 Haw. at 355, 816 P.2d at 304. Although the majority mistakenly noted that a year's lapse between Ross's and Treffry's marriage and Stouffer's decision to enforce the no-relatives policy made their "Hobson's choice" especially painful, that point was immaterial to the majority's analysis and holding. The fact that Stouffer discharged Ross because of his marital status—regardless of when he achieved that status—was the sole determinative factor in *Ross I*.

Notwithstanding the minor factual error in *Ross I*, we stand by its holding that, "as a matter of law, the policy ... of terminating persons who marry other persons working in the same department violates HRS § 378–2 unless the termination falls within one of the exceptions in HRS § 378–3." *Id.* Although Stouffer and the dissent continue to argue that that interpretation is at odds with what they perceive to be legislative intent, we

think the legislature's failure to overrule *Ross I*, despite having well over two years to do so, vindicates the majority's construction of HRS § 378–2. *See State v. Dannenberg*, 74 Haw. 75, 83, 837 P.2d 776, 780 ("where the legislature fails to act in response to our statutory interpretation, the consequence is that the statutory interpretation of the court must be considered to have the tacit approval of the legislature and the effect of legislation."), *reconsideration denied*, —— Haw. ——, 843 P.2d 144 (1992); *accord Gorospe v. Matsui*, 72 Haw. 377, 381, 819 P.2d 80, 82 (1991); *In re Pacific Marine & Supply Co.*, 55 Haw. 572, 579–80, 524 P.2d 890, 896 (1974); *Honolulu Star Bulletin v. Burns*, 50 Haw. 603, 607, 446 P.2d 171, 173 (1968).

In making its charge that the holding in *Ross I* amounts to "judicial legislation," the dissent remains wedded to the notion that the definition of marital status contained in HRS § 378–1 (1985)—"the state of being married or being single"—unambiguously permits employers to discriminate against married persons so long as the discrimination is based on the "identity and occupation of a person's spouse," dissent at 3, and not solely on the fact that he or she is married, regardless of to whom.

That extremely restrictive reading of the statute ignores the simple fact of life that when a person marries, it is always to a particular person with a particular "identity." One does not "marry" in some generic sense, but marries a *specific person*. Thus, the "identity" of one's spouse (and all of his or her attributes, including his or her occupation) is implicitly subsumed within the definition of "being married." The two cannot be separated. It makes no sense, therefore, to conclude, as the dissent does, that an employer who discriminates based on the "identity and occupation" of a person's spouse is not also discriminating against that person because he or she is married. An employer can't do one without the other. Stated otherwise, a no-spouse policy, by definition, applies only to the class of married persons. Consequently, when an employer discharges an employee pursuant to such a policy, it necessarily discriminates "because of ... [the employee's] marital status[.]" HRS

§ 378–2. The facts of this case make the point.

Stouffer does not dispute that under its no-relatives policy, Ross would not have been discharged had he not married Treffry, but had instead chosen to remain single and continue living with her out of wedlock. The policy was triggered only because Ross chose to *marry* Treffry. The event that caused Ross to be discharged, therefore, was the change in his marital status, that is, the change from his "state of . . . being single" (and merely cohabiting with Treffry), HRS § 378–1, to his "state of being married" (and continuing to live with Treffry). *Id.* Granted, the "identity and occupation" of Ross's spouse was also a contributing cause of his discharge. That, however, does not diminish the fact that, but for Ross's marital status, he would not have been fired. Unquestionably, then, Stouffer discharged Ross "because of . . . [his] marital status[.]" HRS § 378–2. The dissent fails to acknowledge that dispositive fact.[5]

The dissent overstates the effect of the holding in *Ross I.* It does not completely "outlaw no-relatives policies." Dissent at 469, 879 P.2d at 1052. Instead, it simply holds that, "as a matter of law, the policy of terminating persons who marry other persons working in the same department violates HRS § 378–2 *unless the termination falls within one of the exceptions in HRS § 378–3.*" 72 Haw. at 355, 816 P.2d at 304 (emphasis added). Such policies, therefore, can be legitimate, but the employer has the burden of proving that they are. That is consistent with the overall purpose and design of Part I of HRS Chapter 378, which, as

noted, defines prohibited discriminatory conduct in very broad terms and places the burden on the employer to justify its practices.

The dissent also overstates our reliance on the legislature's failure to overrule *Ross I.* Dissent at 470–474, 879 P.2d at 1053–1057. We stand by the holding in *Ross I* because, as the above discussion indicates, we believe it was based on a correct construction of the statute. The fact that the legislature has not acted to amend the statute, despite having at least two opportunities to do so in the last three years, *see id.* at 473 n. 8, 879 P.2d at 1056 is surely some indication, although admittedly not conclusive proof, that it agrees with the *Ross I* majority's construction of HRS § 378–2. *See Dannenberg,* 74 Haw. at 83, 837 P.2d at 780.

In sum, contrary to the dissent's charge that we are imposing our view of appropriate public policy in disregard of the legislature's intent, we remain convinced that Stouffer's no-relatives policy as applied to Ross violates the plain language and purpose of HRS § 378–2, unless the termination falls within one of the exceptions in HRS § 378–3. Thus, regardless of whether we believe that our construction of the statute amounts to good or bad public policy, we are constrained to reaffirm the holding of *Ross I.* To do otherwise—that is, to adopt the dissent's construction of the statute—would amount to nothing more than judicial legislation.

### 2. Ross timely filed his administrative complaint with the DLIR

HRS § 378–4(c) (1985), which was in effect at the time Ross filed his administrative com-

---

**5.** The dissent also fails to take into account how easy it would be, under its interpretation of the statute, for an employer to circumvent HRS § 378–2's prohibition against discrimination based on marital status. For instance, an employer who did not want to hire *any* married persons—a practice that the dissent acknowledges would violate HRS § 378–2—could accomplish that objective by devising a policy that discriminated against persons whose spouses met some very common characteristics, *e.g.,* were less than twelve feet tall and were not employed by NASA as astronauts. Under the dissent's view, such a policy, which would effectively preclude the hiring of virtually every married person, would pass muster under HRS § 378–2 because it was cast in terms of the

"identity and occupation" of the married person's spouse. True, such a policy might be challenged as pretextual, but the burden of making such a showing would presumably fall on the employee. That would clearly be contrary to the purposes and structure of Part I of HRS Chapter 378, which defines prohibited discriminatory practices in broadly inclusive terms and places the burden on the employer to prove that one of the exceptions set forth in HRS § 378–3 applies. Moreover, employers bent on circumventing HRS § 378–2 could undoubtedly craft no-spouse policies less obviously transparent than the extreme example cited above, making it difficult for plaintiffs to demonstrate that such policies were pretextual.

plaint with the DLIR, provided that "[n]o complaint shall be filed after the expiration of ninety days after the date upon which the alleged unlawful discriminatory practice occurred."[6] The circuit court concluded that Ross was barred from asserting a claim under HRS § 378–2 because he failed to timely file his complaint with the DLIR.

Stouffer argues that the circuit court correctly concluded that the ninety-day period for Ross to file his complaint with the DLIR commenced on October 20, 1987. It primarily contends that, in an action for unlawful discharge under HRS § 378–2(1), the "alleged unlawful discriminatory practice occur[s]"—that is, the time for filing a complaint with the DLIR begins to run—when an employee is given clear notice that his or her employment will be terminated. In the present case, Stouffer contends, that occurred on October 20, 1987, when Ross received Perry's memo informing him that Stouffer intended to enforce its no-relatives policy and that Ross would be discharged unless either he or Treffry transferred to another department or resigned. So interpreted, Ross failed to comply with HRS § 378–4(c), because his March 14, 1988 DLIR complaint would have been filed fifty-six days too late.

Ross, on the other hand, argues that the operative date is December 15, 1987, the date he was actually dismissed from employment. He asserts that his claim is based on his *discharge*, not on Stouffer's decision to enforce its no-relatives policy, even if that decision made his eventual discharge likely. He therefore contends that the "alleged unlawful discriminatory practice" did not "occur" until Stouffer actually terminated his employment on December 15, 1987. Assuming the validity of Ross's argument, his DLIR complaint was timely because it was filed exactly ninety days after he was actually discharged.

We note initially that the underlying premise of Stouffer's argument and the circuit court's ruling is that the timely filing of an administrative complaint with the DLIR was a precondition to a civil suit under HRS § 378–2. We agree with that premise. HRS § 378–5(e)(1) & (2) (1985), which were in effect when Ross was discharged and when he filed his administrative and circuit court complaints, respectively, empowered the DLIR to "issue a right to sue upon written request of the complainant" and required a "complainant" to bring his or her civil action within ninety days of receiving a notice of right to sue. The logical implication of the legislature's decision to authorize the DLIR to issue a right to sue is that it was a precondition to bringing a civil action for violation of HRS § 378–2; if it were not, the power to issue a right to sue would have been meaningless. Because only a "complainant" could request a right to sue, and because HRS § 378–4(c) prohibited the filing of a complaint more than ninety days after the alleged unlawful discriminatory practice occurred, it necessarily follows that the timely filing of an administrative complaint was a precondition to a civil suit.

█ Reduced to its essence, the legal question before us is whether, in an action for unlawful discharge in violation of HRS § 378–2(1), the "alleged discriminatory practice occur[s]," HRS § 378–4(c), when an employee receives notice that he or she will be discharged or when he or she is actually discharged. The circuit court apparently concluded that notification triggers HRS § 378–4(c)'s statutory filing period. The construction of a statute is a question of law which this court reviews *de novo*. *Richardson v. City and County of Honolulu*, 76 Hawai'i 46, 63, 868 P.2d 1193, 1210, *reconsideration denied*, 76 Hawai'i 247, 871 P.2d 795 (1994).

█ Stouffer urges us to construe HRS § 378–4(c) in accord with *Delaware State College v. Ricks*, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980), and *Chardon v. Fernandez*, 454 U.S. 6, 102 S.Ct. 28, 70 L.Ed.2d 6 (1981) (per curiam), and a line of federal and state employment discrimination cases essentially holding that the time period for

---

**6.** HRS Chapter 368 ("Civil Rights Commission") now provides the mechanism for enforcement of Hawai'i's discrimination laws. HRS § 368–11(c)(1) (Supp.1992) provides that no "complaint shall be filed [with the Civil Rights Commission] after the expiration of one hundred eighty days after the date . . . [u]pon which the alleged unlawful discriminatory practice occurred[.]"

filing an administrative complaint for unlawful discharge commences on the date that notice to terminate is given, not on the date of actual termination. We decline to do so. Instead, we construe HRS § 378–4(c) to mean that, in an action in which an employee claims that he or she was discharged in violation of HRS § 378–2(1), the ninety-day filing period commences when the employee is actually discharged.

Our decision is compelled by the plain language of HRS §§ 378–2 and 378–4(c). When Ross was discharged and when he filed his complaint with the DLIR, HRS § 378–2(1) made it "an unlawful discriminatory practice ... [f]or any employer to ... discharge [an employee] from employment ... because of ... marital status[.]" HRS § 378–4(c), in turn, provided that "[n]o complaint shall be filed after the expiration of ninety days after the date upon which the alleged unlawful discriminatory practice occurred." Laws *in pari materia*, or upon the same subject matter, are interpreted with reference to each other. *Richardson,* 76 Hawaiʻi at 55, 868 P.2d at 1202. Read in conjunction with HRS § 378–2(1), then, HRS § 378–4(c) prohibited any complaint from being filed more than "ninety days after the date upon which the alleged ['*discharge* from employment ... because of ... marital status'] *occurred.*" (Emphasis added.) "Discharge" and "occurred" are the operative words.

▉ In interpreting a statute, we give the operative words their common meaning, unless there is something in the statute requiring a different interpretation. *Schmidt v. Board of Directors of Ass'n. of Apartment Owners of The Marco Polo Apartments,* 73 Haw. 526, 532, 836 P.2d 479, 482 (1992); *State v. Garcia,* 9 Haw.App. 325, 328, 839 P.2d 530, 532 (1992). When used in the employment context, "discharge" means the termination of one's employment. *Black's Law Dictionary,* for instance, defines "discharge" to mean "[t]o dismiss from employment; to terminate the employment of a person." *Black's Law Dictionary* 463 (6th ed. 1990). Nothing in Part I of HRS Chapter 378 indicates that the legislature intended to use "discharge" in a way other than its

ordinary sense. Similarly, nothing in Part I of HRS Chapter 378 indicates that the legislature intended to give "occurred" a meaning other than its commonly understood one. *See The Random House College Dictionary* 920 (rev. ed. 1979) (defining "occur" to mean, *inter alia,* "to happen; come to pass.").

HRS § 378–4(c) uses "occur" in the past tense. Thus, by its express terms, HRS § 378–4(c) provides that the ninety-day filing period begins to run "*after* the ... alleged unlawful discriminatory practice *occurred.*" (Emphasis added.) When the "alleged unlawful discriminatory practice" is the discharge of an employee, that means that the filing period commences *after* he or she has been discharged, that is, *after* his or her employment has terminated.

▉ It is a cardinal rule of statutory interpretation that, where the terms of a statute are plain, unambiguous and explicit, we are not at liberty to look beyond that language for a different meaning. *Kaapu v. Aloha Tower Dev. Corp.,* 74 Haw. 365, 388, 846 P.2d 882, 888–89 (1993). Instead, our sole duty is to give effect to the statute's plain and obvious meaning. *AIG Haw. Ins. Co. v. Estate of Caraang,* 74 Haw. 620, 633–34, 851 P.2d 321, 328 (1993). Accordingly, we hold that, in an action alleging unlawful discharge in violation of HRS § 378–2, the time for filing an administrative complaint begins to run on the date that the employee is actually discharged, that is, on the date that his or her employment terminates.

Departure from the literal construction of the statute would be justified only if such a result were absurd and unjust and obviously inconsistent with the purposes and policies of Part I of HRS Chapter 378. *See Richardson,* 76 Hawaiʻi at 60, 868 P.2d at 1207; *State v. Magoon,* 75 Haw. 164, 178, 858 P.2d 712, 719–20, *reconsideration denied,* —— Haw. ——, 861 P.2d 735 (1993). However, adherence to the plain language of HRS § 378–4(c) produces an eminently sensible and just result that is consistent with the purposes of the Hawaiʻi employment discrimination laws.

A bright line rule that the filing period commences on the date of actual discharge fairly accommodates the interests of both

employees and employers. On the one hand, such a rule favors adjudication of the merits of HRS § 378–2 claims. We think it fair to say that many, if not most, employees become aware of and begin to pursue legal remedies for unlawful discharge only after they have actually been dismissed. Were the time for filing an administrative complaint to begin before that, *i.e.*, upon notification that the employer intended to discharge an employee, it is likely that many employees would have little or, perhaps, no time left to invoke the protections conferred by Part I of HRS Chapter 378 following an unlawful discharge.[7] We think a construction of HRS § 378–4(c) favoring adjudication on the merits is more consistent with the remedial purposes of Part I of HRS Chapter 378 than one likely to bar potentially meritorious claims. As we said in *Puchert v. Agsalud,* 67 Haw. 25, 677 P.2d 449 (1984), *appeal dismissed,* 472 U.S. 1001, 105 S.Ct. 2693, 86 L.Ed.2d 710 (1985), in construing HRS § 378–33(b) (1985), which establishes the time periods within which an employee must file an administrative complaint for wrongful discharge or suspension in violation of HRS § 378–32(2):

> The construction of this section allowing a hearing on the merits and providing the employee with the avenue by which he may be afforded a remedy for the violation of his rights would be more consonant with the legislative enactment of remedial social legislation for workers than would a technical reading which would deny relief without an opportunity to be heard.

*Id.* at 36, 677 P.2d at 457–58.

On the other hand, our reading of HRS § 378–4(c) does not mean that employers will be forced to defend against large numbers of "stale" claims. *See Wiegand v. Allstate Ins.*

*Cos.,* 68 Haw. 117, 122, 706 P.2d 16, 20 (1985). The period between notice of and actual discharge is ordinarily relatively short. We think it unlikely that many claims will become stale in the interim. In addition, because an employer would know—and, presumably, control—when it notified an employee of his or her impending discharge, nothing would prevent it from taking steps to protect against the problems normally associated with stale claims.

Finally, a rule that the filing period commences on the date of actual discharge, like any bright line rule, has the virtue of simplicity. Because it removes any doubt about when the filing period begins, it has the beneficent effect of avoiding the protracted and expensive litigation over the precise date and adequacy of an employer's notice of termination that would inevitably result if we concluded that the date of notice triggered the filing period.

Having construed the meaning of HRS § 378–4(c), we turn to its application in the present case. There is no dispute about the material facts. Ross and Stouffer agree that Ross was discharged on December 15, 1987. There is also no question that the unlawful discriminatory practice alleged in Ross's DLIR and circuit court complaints was his discharge. Therefore, pursuant to HRS § 378–4(c), Ross had ninety days—from December 15, 1987 through March 14, 1988—to file a complaint with the DLIR. Because he filed his complaint on March 14, 1988, he complied with HRS § 378–4(c).

We therefore hold that Stouffer was not entitled to summary judgment on count I on the ground that Ross's DLIR complaint was not timely filed.[8]

7. Those employees savvy enough to know that the time period for filing an administrative complaint might start before they were actually discharged might find themselves in the difficult position of having to file a complaint in which the crucial element—the discharge—had yet to occur. Not only would that be contrary to general principles governing the accrual of causes of action, *see Yamaguchi v. The Queen's Hospital Medical Center,* 65 Haw. 84, 90, 648 P.2d 689, 693–94 (1982); *Waugh v. University of Hawaii,* 63 Haw. 117, 127, 621 P.2d 957, 966 (1980), but it would potentially sour employee/employer re-

lations, thereby diminishing the possibility of an amicable resolution before discharge. That is a particularly real—and unnecessary—risk in cases such as the one before us, where Stouffer's October 20, 1987 notice that it intended to discharge Ross was conditional and held out the hope that Ross and Treffry could continue to work at the Resort if either transferred to another department before December 15, 1987.

8. Stouffer apparently made no attempt following the remand in *Ross I* to show that its discharge of Ross pursuant to its no-relatives policy fit into

### 3. Available Remedies

In addition to various equitable remedies, Ross's amended complaint seeks recovery of compensatory and punitive damages under count I.[9]

At the time Ross was discharged and when he filed his amended complaint in circuit court, HRS § 378–5(f) provided that

> if the court finds that [an employer] has engaged in or is engaging in any unlawful discriminatory practice as defined in this part, *the court may enjoin the [employer] from engaging in such unlawful discriminatory practice and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement, hiring, or upgrading of employees, with or without backpay* . . ., *or any other equitable relief as the court deems appropriate.* Backpay liability shall not accrue from a date more than two years prior to the filing of the complaint with the [DLIR].

HRS § 378–5(f) (1985) (emphasis added). The statute plainly limits available relief to appropriate equitable remedies; it does not authorize the recovery of either compensatory or punitive damages, both of which are traditional legal remedies. *See United States v. Burke,* —— U.S. ——, ——, 112 S.Ct. 1867, 1873, 119 L.Ed.2d 34, 45 (1992) (essentially identical language under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(g), (prior to its amendment in 1991) "does not allow awards for compensatory or punitive damages; instead it limits available remedies to backpay, injunctions, and other equitable relief."); *see also Sparrow v. Commissioner of Internal Revenue,* 949 F.2d 434, 437 (D.C.Cir.1991) (under Title VII backpay is equitable remedy akin to restitution), *cert. denied,* —— U.S. ——, 112 S.Ct. 3009, 120 L.Ed.2d 883 (1992).

■ Ross argues that even if HRS § 378–5(f) provides for only equitable relief, he is still entitled to compensatory and punitive damages under HRS § 368–17(a) (Supp. 1992). He claims that HRS § 368–17(a), which became effective on July 1, 1989 (after Ross filed his amended complaint), allows for the recovery of compensatory and punitive damages in civil actions brought pursuant to Part I of HRS Chapter 378 and should be applied retrospectively.[10] We disagree. Assuming, *arguendo,* that HRS § 368–17(a) permits a court to award compensatory and punitive damages in civil actions brought under Part I of HRS Chapter 378, it does not operate retrospectively. HRS § 1–3 (1985) provides that "[n]o law has any retrospective operation, unless otherwise expressed or obviously intended." We find nothing in the statutory language or legislative history of HRS Chapter 368 (or anywhere else) indicating that the legislature expressly or obviously intended HRS § 368–17(a) to apply retrospectively. It therefore has prospective effect only. *See State v. Nakata,* 76 Haw. 360, 374, 878 P.2d 699, 713 (1994).

Accordingly, we hold that if Ross prevails on his marital discrimination claim (count I) following remand, he is entitled to appropriate equitable relief, including backpay, as provided in HRS § 378–5(f), but he cannot recover any compensatory damages or punitive damages on that claim.

### B. Count II

■ In *Parnar v. Americana Hotels, Inc.,* 65 Haw. 370, 652 P.2d 625 (1982), we recog-

one of the exceptions set forth in HRS § 378–3. We have no clear basis to conclude that Stouffer has either conceded that none of the exceptions applies or that it has waived that argument. It therefore follows that on remand, Stouffer may still attempt to demonstrate that one or more of the exceptions in HRS § 378–3 applies. We simply note that we strongly discourage "piecemeal" litigation and remind all parties and their attorneys of their obligations to litigate responsibly and in good faith. *See In re Tax Appeal of Hawaiian Flour Mills, Inc.,* 76 Hawai'i 1, 17, 868 P.2d 419, 434–35 (1994); *id.* at 17–19, 868 P.2d at 435–37 (Levinson, J., concurring).

9. Count I of Ross's amended complaint seeks compensatory damages for, among other things, "serious mental or emotional distress, depression, embarrassment, loss of enjoyment of life, loss of consortium and other general damages." Count V asserts a separate claim for punitive damages. *See infra* section III.D.

10. HRS § 368–17(a) (Supp.1992) provides in part that "[t]he remedies ordered by the [Civil Rights C]ommission or the court under this chapter may include compensatory and punitive damages and legal and equitable relief[.]"

nized an exception to the judicially created "employment at-will" doctrine, holding that "an employer may be held liable in tort where his discharge of an employee violates a clear mandate of public policy." 65 Haw. at 380, 652 P.2d at 631. Ross asserted a *Parnar* claim, alleging that his discharge violated the public policy of Hawai'i against employment discrimination based on marital status and, more broadly, against discouraging marital relationships. The circuit court dismissed the claim, apparently on the ground that an independent *Parnar* claim could not be maintained where the public policy upon which the claim is based is embodied in a statute, *i.e.,* Part I of HRS Chapter 378, that itself provides a sufficient remedy for its violation.

Several decisions of the United States District Court for the District of Hawai'i have reached the same conclusion on sound reasoning. For instance, in *Lapinad v. Pacific Oldsmobile–GMC, Inc.,* 679 F.Supp. 991 (D.Haw.1988), the court concluded that a *Parnar* claim was

> intended to apply to a "narrow class of cases" where the wrongful discharge action is seen as necessary to effectuate the public policy at stake. If, however, the statutory or regulatory provisions which evidence the public policy themselves provide a remedy for the wrongful discharge, provision of a further remedy under the public policy exception is unnecessary. If the legislature has considered the effect of wrongful discharge on the policies which they are promoting, provision by the courts of a further remedy goes beyond what the legislature itself thought was necessary to effectuate that public policy.

679 F.Supp. at 993. *Accord Hew–Len v. F.W. Woolworth,* 737 F.Supp. 1104, 1107–08 (D.Haw.1990); *Lui v. Intercontinental Hotels Corp. (Hawaii),* 634 F.Supp. 684, 688 (D.Haw.1986).

We agree with the reasoning of those decisions. By making the discharge of an employee "because of ... [his or her] marital status" unlawful, HRS § 378–2(1), and providing a remedial scheme for that discriminatory employment practice, the legislature itself has provided the means for enforcing the public policy that Ross seeks to vindicate through his *Parnar* claim. In other words, even before *Parnar* was decided, the legislature had already done what a *Parnar* claim is designed to do, that is, modify the employment at-will doctrine to further an important public policy. Absent a clear expression of legislative intent to the contrary,[11] we think it is both unnecessary and unwise to permit a judicially created cause of action, which is designed to promote a specific public policy in a "narrow class of cases," *Parnar,* 65 Haw. at 379, 652 P.2d at 631, to be maintained where the policy sought to be vindicated is already embodied in a statute providing its own remedy for its violation. The fact that the relief available under Ross's HRS § 378–2 claim is limited to equitable relief, *see supra* section III.A.3, does not change our conclusion. While the addition of compensatory and punitive damages might enhance the enforcement of the policy against discrimination based on marital status, we do not believe that the available statutory remedies, which are quite broad in their own right, are insufficient to compensate Ross for his employment discrimination claim. *Cf. Smith v. Chaney Brooks Realty, Inc.,* 10 Haw.App. 250, 258–59, 865 P.2d 170, 174 (1994) (because HRS Chapter 388 did not provide sufficient remedy for an employee discharged for asserting rights under its provisions, common law remedy for wrongful discharge was not barred).

Accordingly, we hold that the circuit court properly granted summary judgment in favor of Stouffer on count II of Ross's amended complaint.

### C. *Counts III and IV*

Ross appeals the dismissal of his claims for intentional and negligent infliction of emotional distress.

---

**11.** *Cf.* HRS § 378–69 (Supp.1992), which provides in part that the rights created under the Hawai'i Whisteblowers' Protection Act, Part V of HRS Chapter 378, "shall not be construed to limit the development of the common law nor to preempt the common law rights and remedies on the subject matter of discharges which are contrary to public policy."

### 1. *Intentional Infliction of Emotional Distress*

■ Recovery for intentional infliction of emotional distress is permitted only if the alleged tortfeasor's acts were "unreasonable." *Calleon v. Miyagi*, 76 Hawai'i 310, 321 n. 7, 876 P.2d 1278, 1289 (1994), *as amended*, 76 Hawai'i 453, 879 P.2d 558 (1994); *Chedester v. Stecker*, 64 Haw. 464, 467, 643 P.2d 532, 535 (1982); *Marshall v. University of Hawaii*, 9 Haw.App. 21, 38, 821 P.2d 937, 947 (1991). An act is "unreasonable" if it is " 'without just cause or excuse and beyond all bounds of decency[.]' " *Chedester*, 64 Haw. at 468, 643 P.2d at 535 (quoting *Fraser v. Blue Cross Animal Hosp.*, 39 Haw. 370, 375 (1952)). In other words, the act complained of must be "outrageous," as that term is employed in the *Restatement (Second) of Torts* § 46 (1965).[12] *Id.*

"The question whether the actions of the alleged tortfeasor are unreasonable or outrageous is for the court in the first instance, although where reasonable persons may differ on that question it should be left to the jury." *Wong v. Panis*, 7 Haw.App. 414, 421, 772 P.2d 695, 700 (1989) (citing *Restatement (Second) of Torts* § 46 comment h).

Ross argues that Stouffer acted unreasonably by discharging him for a discriminatory reason unrelated to his work performance and by refusing to consider taking actions short of discharging or transferring him. At a minimum, Ross argues, there is a genuine issue of material fact regarding the unreasonableness of Stouffer's actions, and that issue, therefore, should have been left for the jury to resolve. We disagree.

Ross points to no evidence in the record before us indicating that the manner in which Stouffer discharged Ross, or its motivation for doing so, was unreasonable. He has ad-

duced no evidence that Stouffer believed that the enforcement of its no-relatives policy was unlawful or that Stouffer or any of its employees behaved "beyond all bounds of decency" in discharging him." *See Chedester*, 64 Haw. at 468, 643 P.2d at 535. Ross himself testified in his deposition that he believed that Perry "acted to the best of whatever he believed his consci[ence] was at the time," and admitted that the meetings leading up to Stouffer's decision to enforce the policy were polite. Indeed, the undisputed evidence that Stouffer offered to permit Ross to arrange an in-house transfer and gave him an extended period of time to make a decision about whether to transfer or resign suggests that, under the circumstances, Stouffer acted decently.

Because Ross has failed to adduce any evidence that Stouffer acted unreasonably in the course of discharging him, we hold, on the record before us, that his claim for intentional infliction of emotional distress was properly dismissed on summary judgment.

### 2. *Negligent Infliction of Emotional Distress*

■ Ross contends that the circuit court erred in dismissing his claim for negligent infliction of emotional distress, arguing that recovery is allowed in the absence of a physically manifested injury. On that point, Ross is correct; we have held that recovery is permitted without a showing of physically manifested harm. *Campbell v. Animal Quarantine Station*, 63 Haw. 557, 560, 632 P.2d 1066, 1068 (1981); *Rodrigues v. State*, 52 Haw. 156, 472 P.2d 509 (1970). We have also held, however, that recovery for negligent infliction of emotional distress by one not physically injured is generally permitted only when there is "some physical injury to property or a person" resulting from the

---

12. In explaining the type of "outrageous" conduct that makes a claim for intentional infliction of emotional distress actionable, the *Restatement (Second) of Torts* states:

It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.

Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Restatement (Second) of Torts* § 46 comment d.

defendant's conduct. *Chedester*, 64 Haw. at 468, 643 P.2d at 535.[13]

We adhere to that general rule in the context of this case. Ross has presented no evidence of any physical injury to himself or anyone else. Accordingly, we hold that the circuit court properly entered summary judgment in favor of Stouffer on Ross's negligent infliction of emotional distress claim. *See Calleon*, 76 Hawai'i at 320, 876 P.2d at 1288.

### D. *Count V*

■ The circuit court dismissed count V of Ross's amended complaint seeking punitive damages. Ross acknowledges that a claim for punitive damages is not an independent tort, but is purely incidental to a separate cause of action. *See Kang v. Harrington*, 59 Haw. 652, 660, 587 P.2d 285, 291 (1978). In light of our holdings above affirming the dismissal of counts II, III, IV, and VI of Ross's amended complaint, as well as our holding that punitive damages are not recoverable on Ross's HRS § 378–2 claim (count I), the only remaining claim that might be the basis for the recovery of punitive damages is count VII, breach of implied contract. In order to recover punitive damages based on a breach of a contract, one must show that "the contract [was] breached in such a wilful, wanton or reckless manner as to result in a tortious injury." *Amfac, Inc. v. Waikiki Beachcomber Investment Co.*, 74 Haw. 85, 139 n. 23, 839 P.2d 10, 37 n. 23 (citing *Quedding v. Arisumi Brothers, Inc.*, 66 Haw. 335, 661 P.2d 706 (1983); *Dold v. Outrigger Hotel*, 54 Haw. 18, 22, 501 P.2d 368, 372 (1972)), *reconsideration denied*, 74 Haw. 650, 843 P.2d 144 (1992).

■ It is not clear to us whether Ross asserts a separate claim for *tortious* breach of contract, in addition to his claim for breach of implied contract. Assuming that he does, we find no evidence in the record even suggesting that, if Stouffer did breach the alleged implied contract, the breach was done in such a "wilful, wanton or reckless manner" that punitive damages would be justified. *Id.; Masaki v. General Motors Corp.*, 71

Haw. 1, 16–17, 780 P.2d 566, 575, *reconsideration denied*, 71 Haw. 664, 833 P.2d 899 (1989).

Accordingly, we hold that Ross cannot recover punitive damages for tortious breach of contract and that the circuit court properly dismissed count V of Ross's amended complaint.

### E. *Count VI*

As noted above, because Ross has not assigned the dismissal of count VI as a point of error on appeal and has not addressed the claim in his briefs, we hold that he has waived any argument that count VI was improperly dismissed. HRAP 28(b)(4) and 28(b)(7). We therefore affirm the summary judgment in Stouffer's favor on count VI.

### F. *Rule 7(F) of the Hawai'i Arbitration Rules*

■ Ross finally argues that Stouffer's motion for partial summary judgment, in which it sought summary judgment on counts II through VII, was improper under Hawai'i Arbitration Rules (HAR) 7(F) (1991) because it did not seek to dispose of all claims (*i.e.*, Stouffer had yet to move for summary judgment on count I). HAR 7(F) provides that "[a]ll dispositive motions shall be made to the Circuit Court as required by law or rule notwithstanding the fact that a case is under the [Court Annexed Arbitration] Program."

Nothing in HAR 7(F) explicitly requires a dispositive motion to include every claim, and Ross offers no authority to support his argument. While we share Ross's concern about "piecemeal" litigation, especially with respect to cases assigned to the Court Annexed Arbitration Program, which is intended "to provide a prompt and equitable .resolution of certain civil matters[,]" HAR 2(A) (1991), we hold that Stouffer's motion for partial summary judgment, which sought dismissal of six of Ross's seven claims, did not violate HAR 7(F).

---

**13.** Note that HRS § 663–8.9 (Supp.1992) now provides that one who is not physically injured or suffering from mental illness may not recover for negligent infliction of emotional distress "if the distress or disturbance arises solely out of damage to property or material objects."

## IV. CONCLUSION

For the foregoing reasons, we vacate the summary judgment entered on August 27, 1992 as to count I of Ross's amended complaint (the HRS § 378–2 claim), affirm the summary judgment as to counts II through VI, and remand for further proceedings consistent with this opinion.

KLEIN, Justice, concurring and dissenting, with whom MOON, Chief Justice, joins.

I concur in the majority opinion except as to part III.A.1. Because I believe we should overrule *Ross v. Stouffer Hotel Company (Hawaii) Ltd.*, 72 Haw. 350, 816 P.2d 302, *reconsideration denied*, 72 Haw. 616, 841 P.2d 1074 (1991) (*Ross I* ), I would affirm the trial court's judgment as to Count I. Accordingly, as to part III.A.1, I dissent.

### I.

In his dissent to *Ross I,* Justice Wakatsuki asserted that "[r]ather than focusing on interpreting Hawai['] Revised Statutes (HRS) § 378–2, the majority [in *Ross I* ] ... overstep[ped] judicial bounds by legislating an important policy issue affecting business management-labor relations that should better be left to the legislature to decide." *Ross I*, 72 Haw. at 355, 816 P.2d at 304–05 (Wakatsuki, J., dissenting, joined by Moon, J.). I agree with the *Ross I* dissent and take this opportunity to elaborate on the reasons that *Ross I* was wrongly decided and amounted to judicial legislation.

### A.

"When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself." *Pacific Int'l Servs. Corp. v. Hurip,* 76 Hawai'i 209, 216, 873 P.2d 88, 95 (1994) (internal quotation marks omitted). Of course, the "[s]tatutory language must be read in the context of the entire statute and construed in a manner consistent with the purpose of the statutes," *Methven–Abreu v. Hawaiian Ins. & Guar. Co.,* 73 Haw. 385, 392, 834 P.2d 279, 284

(internal quotation marks omitted), *reconsideration denied,* 73 Haw. 625, 838 P.2d 860 (1992), and when determining the purpose of the statute, "we are not limited to the words of the statute to discern the underlying policy which the legislature seeks to promulgate ... [but may] look to relevant legislative history[.]" *Sol v. AIG Hawaii Ins. Co.,* 76 Hawai'i 304, 307, 875 P.2d 921, 924 (citation and internal quotation marks omitted), *reconsideration denied,* 76 Hawai'i 353, 877 P.2d 890 (1994).

Conversely, we are not at liberty to interpret a statutory provision to further a policy that is not articulated in either the language of the statute or the relevant legislative history, even if we believe that such an interpretation would produce a more beneficent result, for "[t]he Court's function in the application and interpretation of such laws must be carefully limited to avoid encroaching on the power of [the legislature] to determine policies and make laws to carry them out." *Boys Markets, Inc. v. Retail Clerks Union, Local 770,* 398 U.S. 235, 256–57, 90 S.Ct. 1583, 1595, 26 L.Ed.2d 199 (1970) (Black, J., dissenting). When a court goes beyond the articulated purposes underlying statutory or constitutional provisions and imposes its own view of appropriate public policy, that court improperly engages in judicial legislation.

### B.

By enacting HRS § 378–2 (1985), the legislature prohibited employment discrimination based on, among other things, "marital status." *See* Majority at 456, 879 P.2d at 1039, n. 2. The legislature, in addition, expressly limited the scope of marital status discrimination to that based on "the state of being married or being single." HRS § 378–1 (1985). There are absolutely no indications in the legislative record that, despite the statutory definition, the legislature intended to also prohibit discrimination based on the identity and occupation of a person's spouse. Accordingly, a proper judicial construction of marital status discrimination must be limited to discrimination based on "the state of being married or being single." *See Moore v. Honeywell Information Sys.,* 558 F.Supp. 1229, 1231 (D.Haw.1983) (rejecting claim of

marital status discrimination under HRS § 378–2 where plaintiff was terminated, not because she was a married person, but because of her spouse's interest in a competing business).

The *Ross I* majority overstepped the bounds of its judicial role by disregarding the definition of "marital status" contained in HRS § 378–1 and expanding the scope of marital status discrimination to suit its view of appropriate public policy. *See Ross I*, 72 Haw. at 354, 816 P.2d at 304 ("The public policy argument behind encouraging marital relationships, enunciated in those opinions and comments[,] seems to us persuasive as applied to the facts of this case."). The *Ross I* majority undoubtedly had good intentions and sought to implement what it viewed as the wiser policy. The role of the court, however, is not to set policy, but to interpret the statutes as enacted by the legislature. *See supra*, dissent at 467, 879 P.2d at 1050. By expanding the scope of marital status discrimination to further a policy that was not articulated by the legislature, the *Ross I* majority improperly abdicated its judicial role for a legislative one.

The *Ross I* majority apparently felt that it could impose its policy preference because opinions from courts of other jurisdictions had reached opposing results when interpreting their respective states' prohibitions on marital status discrimination. 72 Haw. at 353–54, 816 P.2d at 303–04. Not one of those states' statutes, however, contained definitions of "marital status." Those statutes were, therefore, arguably susceptible to broader interpretations.[1] Consequently, the differing interpretations given to marital status discrimination for purposes of those stat-

utes in no way gave this court the authority to disregard the express statutory definition of "marital status" contained in HRS § 378–1.

Moreover, an examination of subsequent legislative and judicial activity in states whose courts had adopted a broad interpretation of marital status discrimination under their statutes demonstrates that the lack of an express definition of "marital status" in their statutes was a crucial factor in allowing them to do so. In Minnesota, for example, subsequent to the decision in *Kraft, Inc. v. State*, 284 N.W.2d 386 (Minn.1979), the state legislature added a statutory definition of "marital status" as follows:

> "Marital status" means whether a person is single, married, remarried, divorced, separated, or a surviving spouse and, in employment cases, includes protection against discrimination on the basis of the identity, situation, actions, or beliefs of a spouse or former spouse.

Minn.Stat. § 363.01.40 (1988). Although the statutory definition upheld the result reached in *Kraft*, the definition clearly indicated that discrimination based on a spouse's identity is fundamentally different from discrimination based on whether a person is single, married, etc. In *State v. French*, 460 N.W.2d 2 (Minn. 1990), the Supreme Court of Minnesota expressly recognized that distinction, stating:

> *The plain language of this new definition shows that, in non-employment cases, the legislature intended to address only the status of an individual, not an individual's relationship with a spouse, fiancé, fiancée, or other domestic partner.* The extremely broad language following the

1. Even in the absence of an express statutory definition of "marital status," several courts in other jurisdictions have recognized that the plain meaning of "marital status" does not encompass the identity or occupation of a person's spouse. *See, e.g., Miller v. C.A. Muer Corp.*, 420 Mich. 355, 361–63, 362 N.W.2d 650, 653–54 (1984) (no definition of "marital status" in Michigan act; by placing prohibition against "marital status" discrimination in Michigan civil rights act, "the Legislature manifested its intent to prohibit discrimination based on *whether* a person is married" (emphasis in original); not that based on "the identity, occupation, and place of employment of one's spouse"); *Manhattan Pizza Hut v.*

*New York State Human Rights Appeal Bd.*, 51 N.Y.2d 506, 511, 434 N.Y.S.2d 961, 964, 415 N.E.2d 950, 953 (1980) ("the plain and ordinary meaning of 'marital status' is the social condition enjoyed by an individual by reason of his or her having participated or failed to participate in a marriage"); *see also Commission on Human Relations v. Greenbelt Homes, Inc.*, 300 Md. 75, 86, 475 A.2d 1192, 1198 (1984) (quoting *Manhattan Pizza Hut* with approval). The decisions that reached the opposite conclusion and influenced the *Ross I* majority have consequently been described as "eccentric". *See Townshend v. Board of Educ.*, 183 W.Va. 418, 423 n. 4, 396 S.E.2d 185, 190 n. 4 (1990).

phrase "and, in employment cases" constitutes legislative recognition that employment cases are fundamentally different from housing cases such as the case at bar. 460 N.W.2d at 6 (emphasis added).[2] The Minnesota definition of "marital status" applicable in non-employment cases that does not include "an individual's relationship with a spouse" is essentially the same as the definition of "marital status" found in HRS § 378–1. By clear analogy, "marital status" under HRS § 378–1 should not include "an individual's relationship with a spouse."

The Washington legislature added a definition of marital status to its statute that is even more similar to HRS § 378–1 than Minnesota's definition. That definition provides:

> "Marital status" means the legal status of being married, single, separated, divorced, or widowed.

Wash.Rev.Code § 49.60.040 (Supp.1993). In *Kastanis v. Educational Employees Credit Union*, 122 Wash.2d 483, 859 P.2d 26, *opinion amended by* —— Wash.2d ——, 865 P.2d 507 (1993), the Supreme Court of Washington, although following the broad interpretation of marital status discrimination adopted in *Washington Water Power Co. v. State Human Rights Comm'n*, 91 Wash.2d 62, 586 P.2d 1149 (1978) and its progeny, implied that it was able to do so because the 1993 definition of "marital status" was not before the court. 122 Wash.2d at 488 & n. 3, 859 P.2d at 29 & n. 2. The juxtaposition of the judicial interpretation that was adopted in the absence of a statutory definition and the definition enacted by the legislature[3] clearly demonstrates that the statutory definition limits the scope of "marital status" and does not encompass the additional factor of the identity of an employee's or applicant's spouse.

No-relatives policies such as the one that led to Ross's discharge are based on the identity of an employee's or applicant's spouse and do not discriminate based on "the state of being married or being single." Thus, the enforcement of a no-relatives policy does not constitute "marital status" discrimination under HRS § 378–2.

Furthermore, there is nothing in the legislative history to suggest that, in spite of the plain language, the statute was intended to outlaw no-relatives policies. As noted in the *Ross I* dissent, "[a] prohibition of discrimination on the basis of identification of one's spouse covers a wide array of personnel policies, including antinepotism policies, policies against hiring the spouse of a major business competitor, and policies against having spouses in supervisor-supervisee capacities." 72 Haw. at 357, 816 P.2d at 305.

> [A]nti-nepotism rules are standard practice and date back to the turn of the Century. Today many private companies have antinepotism policies that restrict spouses from working under the same chain of command. A 1981 survey of 374 companies reported that of the 82 percent who would employ both husbands and wives, 74 percent restrict spouses from working in the same department or in the same function. A 1985 survey of 115 companies reported that 46 percent prohibit supervision by a relative. U. Sekaran, *Dual-Career Families* (1986) 120.

*Townshend*, 183 W.Va. at 421, 396 S.E.2d at 188. Against this backdrop, "[i]t is implausible 'that the Legislature would have struck a blow at [such] policies with nary a word, in or out of the statute, to express or explain its intention.'" *Ross I*, 72 Haw. at 357, 816 P.2d at 305 (Wakatsuki, J., dissenting) (quoting *Manhattan Pizza Hut*, 51 N.Y.2d at 513, 434 N.Y.S.2d at 964, 415 N.E.2d at 953). *See also Whirlpool Corp. v. Michigan Civil*

---

**2.** The court in *French* held that the statutory prohibition against marital status discrimination in housing did not prevent the owner of property from refusing to rent to a person who planned to live together in a sexual relationship with another person to whom she was not legally married.

**3.** Under the judicially adopted interpretation, "[t]he meaning of marital status ... is not limited to conditions such as being married, single, or

divorced, but also applies to antinepotism policies based on the identity of an employee's or applicant's spouse." *Kastanis*, 122 Wash.2d at 488, 859 P.2d at 29 (footnote omitted). The legislatively enacted definition, on the other hand, expressly limits "marital status" to "the legal status of being married, single, separated, divorced, or widowed." Wash.Rev.Code § 49.60.040.

*Rights Comm'n,* 425 Mich. 527, 531, 390 N.W.2d 625, 627 (1986) ("The question here is one of legislative intent, and we do not believe the Legislature intended to so severely regulate employers' personnel policies so as to prohibit no-spouse rules. If the lawmakers did intend such a change, then their intent must be manifested more clearly.").

Moreover, the public policy of "encouraging marital relationships," *Ross I,* 72 Haw. at 354, 816 P.2d at 304, on which the *Ross I* majority avowedly relied, finds no support in the language of HRS § 378–2 or its legislative history. On the contrary, HRS § 378–2 provides the same protection against discrimination to persons who are single as to those who are married. Thus, *Ross I* was incorrectly decided and amounted to judicial legislation.

## II.

The majority opinion dismisses Stouffer's plea to overrule *Ross I* on the grounds that (1) a factual error regarding the date of Ross's marriage "was immaterial to the [*Ross I*] majority's analysis and holding," and (2) "the legislature's failure to overrule *Ross I* . . . vindicates the [*Ross I*] majority's construction of HRS § 378–2." Majority at 458, 879 P.2d at 1041. I agree that whether Ross's marriage occurred two months or fourteen months before he was terminated is immaterial to the issue of marital status discrimination. *See Ross I,* 72 Haw. at 358, 816 P.2d at 305–06 (Wakatsuki, J., dissenting) (noting that the fact that Stouffer may have waited over a year after Ross's marriage before discharging him was "immaterial and irrelevant to the issue before us"). I cannot, however, agree that mere legislative inaction precludes us from reconsidering *Ross I.*

## A.

As a general rule, "[w]e do not lightly disregard precedent; we subscribe to the view that great consideration should always be accorded precedent, especially one of long standing and general acceptance." *Espaniola v. Cawdrey Mars Joint Venture,* 68 Haw. 171, 182, 707 P.2d 365, 373 (1985) (citation and internal quotation marks omitted). *See*

*also Briones v. State,* 74 Haw. 442, 453 n. 5, 848 P.2d 966, 972 n. 5 (1993) ("This court will not create a precedential quagmire by reexamining via a [Hawai'i Rules of Penal Procedure (HRPP)] rule 40 petition its own opinions on the basis that the first appeal was incorrectly decided.").

Yet, it doesn't necessarily follow that a rule established by precedent is infallible. If unintended injury would result by following the previous decision, corrective action is in order; for we cannot be unmindful of the lessons furnished by our own consciousness, as well as by judicial history, of the liability to error [sic] and the advantages of review.

*Espaniola,* 68 Haw. at 182, 707 P.2d at 373 (citations and internal quotation marks omitted). Indeed, "[w]e not only have the right but are entrusted with a duty to examine the former decisions of this court and when reconciliation is impossible, to discard our former errors." *Koike v. Board of Water Supply,* 44 Haw. 100, 117–18, 352 P.2d 835, 845, *reh'g denied,* 44 Haw. 146, 352 P.2d 835 (1960); *see also Parke v. Parke,* 25 Haw. 397, 401 (1920) ("It is generally better to establish a new rule than to follow a bad precedent.").

## B.

The majority relies on *State v. Dannenberg,* 74 Haw. 75, 83, 837 P.2d 776, 780, *reconsideration denied,* —— Haw. ——, 843 P.2d 144 (1992), and the cases cited therein, to support the proposition that we should not reconsider *Ross I* because the legislature has not overruled that decision. Majority at 458, 879 P.2d at 1041. Each of those cases was applying the doctrine of *stare decisis.* "*Stare decisis* relates to the effect of legal propositions announced in prior adjudications upon subsequent actions which involve similar questions between strangers to the proceedings in which the adjudications were made." *State v. Magoon,* 75 Haw. 164, 186, 858 P.2d 712, 723 (internal quotation marks and emphasis omitted), *reconsideration denied,* —— Haw. ——, 861 P.2d 735 (1993). The appeal before us now is part of the same action as *Ross I* and involves the identical parties. Thus, the doctrine of *stare decisis*

does not apply, and the cases regarding legislative inaction are not directly applicable.

On the other hand, under the "law of the case" doctrine, "a determination of a question of law made by an appellate court in the course of an action becomes 'the law of the case' and may not be disputed by a reopening of the question at a later stage of litigation." *Robinson v. Ariyoshi*, 65 Haw. 641, 652 n. 9, 658 P.2d 287, 297 n. 9 (1982) (quoting *Glover v. Fong*, 42 Haw. 560, 578 (1958)), *reconsideration denied*, 66 Haw. 528, 726 P.2d 1133 (1983). The doctrine, however, is merely "a rule of practice based on considerations of efficiency, courtesy, and comity," *Amfac v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 121, 839 P.2d 10, 29 (quoting *State v. Goodwin*, 7 Haw.App. 261, 263 n. 2, 752 P.2d 598, 600 n. 2 (1988)), *reconsideration denied*, 74 Haw. 650, 843 P.2d 144 (1992), and "where justice requires, exceptions to the doctrine of law of the case are made and we may re-examine our holdings on the second appeal in the same case." *Cain v. Cain*, 59 Haw. 32, 37, 575 P.2d 468, 473 (1978).

The "law of the case" doctrine does not present as formidable an obstacle to reconsideration as the doctrine of *stare decisis* or the related doctrine of *res judicata*.[4] This court has explicitly recognized that the "law of the case" doctrine "is akin to res judicata ... but is not subject to the inflexibility of res judicata." *Robinson*, 65 Haw. at 652 n. 9, 658 P.2d at 297 n. 9 (quoting *Glover*, 42 Haw.

at 578). Similarly, because the "law of the case" doctrine implicates fewer policy considerations than the *stare decisis* doctrine,[5] we should have less reservations regarding reconsidering a decision when the "law of the case" doctrine is the only deterrent to doing so.

Furthermore, *Ross I* was decided by the slimmest of majorities (3–2 decision). It would only require one member of the *Ross I* majority to recognize that the original appeal was wrongly decided and amounted to judicial legislation in order for that decision to be overruled.[6] Under these circumstances, any argument that the principles of the "law of the case" doctrine should prevent us from reconsidering *Ross I* is particularly unavailing.

## C.

Because the original appeal resulted in a published opinion, an argument can be made that legislative inaction should be given the same weight as if the issue had arisen in a case where *stare decisis* applied. Even assuming that legislative inaction may be entitled to some weight,

> conclusive weight should [not] be accorded to the failure of [the legislature] to respond to [a prior decision of this court] on the theory that [legislative] silence should be interpreted as acceptance of the decision. The [United States Supreme] Court has cautioned that '[i]t is at best treacherous to

---

4. We defined the scope and effect of the doctrine of *res judicata* in *Kauhane v. Acutron Co.*, 71 Haw. 458, 795 P.2d 276 (1990) as follows:

   According to the doctrine of res judicata, the judgment of a court of competent jurisdiction is a bar to a new action in any court between the same parties or their privies concerning the same subject matter, and precludes the relitigation, not only of the claims which were actually litigated in the first action, but also of all grounds of claim which may have been properly litigated in the first action but were not litigated or decided.

   71 Haw. at 463, 795 P.2d at 278 (internal quotation marks and brackets omitted). Because the instant appeal does not arise out of a "new action" the doctrine of *res judicata* does not apply. *See Robinson*, 65 Haw. at 652, 658 P.2d at 296–97; *Cain*, 59 Haw. at 35–36, 575 P.2d at 472–73.

5. The factors favoring adherence to principles of *stare decisis* include "considerations of certainty

and the equal treatment of similarly situated litigants." *Boys Markets, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235, 257, 90 S.Ct. 1583, 1596, 26 L.Ed.2d 199 (1970) (Black, J., dissenting). When addressing a second appeal in the same case, overruling the decision reached in the first appeal will not result in disparate treatment of similarly situated litigants.

6. The fact that the composition of the court has changed since *Ross I* was decided, although in and of itself not a sound reason to reconsider that decision, is not a bar to reconsideration under the "law of the case" doctrine. *Cf. Yoshizaki v. Hilo Hosp.*, 50 Haw. 40, 429 P.2d 829 (holding that change in composition of the court was not a bar to a grant of rehearing, particularly when there was a three to two division on the original opinion), *granting petition for reh'g of* 50 Haw. 1, 427 P.2d 845 (1967).

find in congressional silence alone the adoption of a controlling rule of law.' *Girouard v. United States,* 328 U.S. 61, 69 [66 S.Ct. 826, 830, 90 L.Ed. 1084] (1946). Therefore, in the absence of any persuasive circumstances evidencing a clear design that [legislative] inaction be taken as acceptance of [the prior decision], the mere silence of [the legislature] is not a sufficient reason for refusing to reconsider the decision.

*Boys Markets,* 398 U.S. at 241–42, 90 S.Ct. at 1587–88. Thus, the mere failure of the legislature to amend HRS § 378–2 after *Ross I* was decided, without more, is unpersuasive. *Cf. Monell v. Department of Social Servs. of New York,* 436 U.S. 658, 696–700, 98 S.Ct. 2018, 2038–41, 56 L.Ed.2d 611 (1978) (Congress's failure to amend the definition of "persons" as used in 42 U.S.C. § 1983 during seventeen years following *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), did not amount to an "indication[ ] of congressional acceptance of th[e] Court's earlier interpretation.").

That legislative inaction, in and of itself, is entitled to little weight is evident from a review of several decisions of this court in which we have overruled our own earlier statutory interpretations despite legislative inaction. *See, e.g., Magoon,* 75 Haw. at 185–86, 858 P.2d at 722–23 (explicitly overruling *In re Application of Kaimuki Land Co.,* 35 Haw. 254 (1939), because it failed to correctly review and analyze the statutory estoppel language of Revised Laws of Hawai'i (RLH) 1935 § 5032); *State v. Dow,* 72 Haw. 56, 59–61, 806 P.2d 402, 404–05 (1991) (overruling in part *State v. Wacker,* 70 Haw. 332, 770 P.2d 420 (1989), because "the statutory analysis employed in *Wacker* [was] no longer applicable"); *State v. Batangan,* 71 Haw. 552, 559–63, 799 P.2d 48, 52–54 (1990) (holding that Rules 702 and 704 of the Hawai'i Rules of Evidence do not allow expert witnesses to

opine as to the credibility of alleged child sex abuse victims and overruling *State v. Kim,* 64 Haw. 598, 645 P.2d 1330 (1982), to the extent that it held otherwise); *Association of Owners of Kukui Plaza v. Swinerton & Walberg Co.,* 68 Haw. 98, 106–07, 705 P.2d 28, 34–35 (1985) (holding that orders granting stays of proceedings and compelling arbitration are final orders under HRS § 641–1(a) and overruling holding to the contrary in *Pfaeltzer v. Patterson,* 49 Haw. 59, 410 P.2d 974 (1966)).[7] *See also Briones,* 74 Haw. at 470, 848 P.2d at 979 (Levinson, J., concurring) ("[T]he holding of [*State v. Briones* ] *Briones I* [, 71 Haw. 86, 784 P.2d 860 (1989), was] tantamount to appellate 'plain error' and we should [have] simply 'fess[ed] up' to it.").

*State v. Dannenberg,* 74 Haw. 75, 837 P.2d 776 (1992), and the cases cited therein, on which the majority opinion relies for the proposition that we should uphold prior decisions of statutory interpretation in the face of legislative inaction are all distinguishable. In each of those cases, the statutory scheme was ambiguous and the court had resolved the ambiguity by applying applicable rules of statutory construction. In *Dannenberg,* we declined to overrule the holding of *State v. Rice,* 66 Haw. 101, 657 P.2d 1026 (1983), that HRS § 712–1200(4) precluded trial courts from granting motions for deferred acceptance of guilty pleas in prostitution cases. In that case, we agreed that "HRS § 712–1200 [was] ambiguous," 74 Haw. at 80, 837 P.2d at 778, and we resolved the ambiguity by seeking to ascertain the legislative intent. In *Gorospe v. Matsui,* 72 Haw. 377, 380–81, 819 P.2d 80, 81–82 (1991), we reaffirmed our analysis in *Zator v. State Farm Mutual Automobile Insurance Co.,* 69 Haw. 594, 752 P.2d 1073 (1988), where we held that the tolling provisions of HRS § 657–13 applied to toll the two year statute of limitations set forth in HRS § 294–36 for bringing a suit for

---

7. Similarly, we have occasionally overruled our analyses of certain rules of court although the language of the rules has remained unchanged. *See, e.g., State v. Young,* 73 Haw. 217, 220–22, 830 P.2d 512, 514–15 (1992) (holding that pursuant to HRPP Rule 5 the waiver of the right to jury trial must be either in writing signed by the defendant or in open court from the mouth of the defendant, and overruling *State v. Olivera,* 53

Haw. 551, 497 P.2d 1360 (1972) to the extent that it countenanced waiver by trial counsel); *State v. Balauro,* 73 Haw. 70, 71, 828 P.2d 267, 268 (1992) (overruling *State v. Stone,* 65 Haw. 308, 651 P.2d 485 (1982) to the extent that its holding regarding excludable time periods under HRPP Rule 48 was inconsistent with subsection (c)(6) of that rule).

no-fault benefits. In that case, "the two statutes obviously create[d] an ambiguity," 72 Haw. at 381, 819 P.2d at 82 (quoting *Zator*, 69 Haw. at 597, 752 P.2d at 1075), and we resolved the ambiguity by seeking to ascertain the legislative intent. In *In re Tax Appeal of Pacific Marine & Supply Co.*, 55 Haw. 572, 576–79, 524 P.2d 890, 893–96 (1974), this court refused to overrule the interpretation of the term "structures," as used in HRS § 273–6 and its predecessor statutes, which was followed by the Tax Appeal Court in *Taxes, Hawaiian Dredging Company, Ltd.*, Cases No. 631, 632 (June 8, 1955). The court reasoned that ships and vessels were not "structures" within the ordinary meaning of that word, and even assuming an ambiguity in the statute, established rules of statutory construction supported that interpretation. Finally, in *Honolulu Star Bulletin v. Burns*, 50 Haw. 603, 604–06, 446 P.2d 171, 172–73 (1968), the appellant urged this court to overrule *Advertiser Publishing Co. v. Fase*, 43 Haw. 154 (1959), *aff'd*, 279 F.2d 636 (9th Cir.1960), arguing that the court had misinterpreted the definition of "manufacturer" for purposes of RLH 1945 § 5455(A). The court found that there was "sufficient ambiguity in the language [of the statute] to compel us to invoke such appropriate rules of statutory construction as will aid us in ascertaining the legislative intent in this matter." 50 Haw. at 604, 446 P.2d at 172. The court then applied the said rules of construction and concluded that the interpretation of "manufacturer" in *Advertiser Publishing* was the correct interpretation.

Furthermore, in addition to involving the proper resolution of ambiguous statutory provision, in most of the cases that relied on legislative inaction, a significant length of time had passed since the original decision. *See, e.g., Dannenberg* (decided nearly ten years after *Rice* ); *Pacific Marine & Supply Co.* (decided nineteen years after *Taxes, Ha-*

*waiian Dredging Company, Ltd.*); *Honolulu Star Bulletin* (decided nine years after *Advertiser Publishing* ).

In the instant case, the meaning of marital status discrimination under HRS § 378–2 was not ambiguous and the analysis in *Ross I* was judicially unsound. *See supra*, dissent at 467–470, 879 P.2d at 1050–1053. Moreover, it has been only three years since *Ross I* was decided.[8] For these reasons, the majority's reliance on *Dannenberg* and the cases cited therein is misplaced.

### D.

Legislative inaction is a particularly unconvincing basis to decline to reconsider a decision when the original decision was tantamount to judicial legislation. Our duty to correct erroneous decisions is at its greatest in such circumstances, for "while unconstitutional exercise of power by the executive and legislative branches of government is subject to judicial restraint, the only check upon our own exercise of power is our own sense of self-restraint." *Koike v. Board of Water Supply*, 44 Haw. 100, 103, 352 P.2d 835, 838 (quoting *United States v. Butler*, 297 U.S. 1, 78–79, 56 S.Ct. 312, 324–25, 80 L.Ed. 477 (1936) (Stone, J., dissenting)), *reh'g denied*, 44 Haw. 146, 352 P.2d 835 (1960). Because of the complexities of passing legislation, it is not fair to place the burden on the legislature to enact corrective legislation. *See Monell*, 436 U.S. at 695, 98 S.Ct. at 2038 (overruling interpretation of the term "persons," as used in 42 U.S.C. § 1983, that was adopted in *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), reasoning that the case was not one "where [the Court] should 'place on the shoulders of Congress the burden of the Court's own error' " (quoting *Girouard*, 328 U.S. at 70, 66 S.Ct. at 830)). Thus, because *Ross I* was wrongly decided and

---

**8.** Although Ross points to the fact that bills were introduced during both the 1992 and 1993 legislative sessions seeking to add language to HRS § 378–3 that would explicitly address the validity of company policies prohibiting spouses from working together, those bills were among 2,158 House Bills and 1,928 Senate Bills introduced in 1993 and 1,684 House Bills and 1,287 Senate Bills introduced in 1992. In light of the fact that all of these bills resulted in the enactment of only 365 Acts in 1993 and 323 Acts in 1992, the legislature's failure to overrule *Ross I* is entitled to little weight. Furthermore, no committee reports were generated concerning the bills that were introduced, and no other indications as to whether the legislature approved or disapproved of the decision reached in *Ross I* have been brought to our attention.

amounted to judicial legislation, we have a duty to reconsider and overrule that decision.

### III.

In this appeal, we have the opportunity to rectify one instance where this court "over-step[ped] judicial bounds by legislating an important policy issue ... that should [have been] left to the legislature to decide," *Ross I,* 72 Haw. at 355, 816 P.2d at 304–05 (Wakat-suki, J., dissenting, joined by Moon, J.), and reestablish our commitment to act within the constraints of our judicial role. We should therefore reconsider *Ross I,* overrule that decision, and limit claims of marital status discrimination under HRS § 378–2 to situations involving discrimination based on "the state of being married or being single."