In the Matter of JOAN L. SANBONMATSU, Appellant, *v.* ERNEST L. BOYER, as Chancellor of the State University of New York, et al., Respondents.

Fourth Department, July 5, 1974.

*Beckerman, Davidson, Cook & Fink* (*Thomas A. Fink* of counsel), for appellant.

*Louis J. Lefkowitz, Attorney-General* (*Ruth Kessler Toch* and *Winifred C. Stanley* of counsel), for respondents.

SIMONS, J. Appellant, Dr. Joan Sanbonmatsu, and her husband, Dr. Akira Sanbonmatsu, are speech professors. Not surprisingly, they find it both convenient and desirable to teach at the same institution, in this case the State University College

at Brockport. At the time of this proceeding, however, the so-called nepotism rule (8 NYCRR 335.16–335.18) of the State University of New York prohibited the "parent, child, brother, sister, husband or wife of any member of the academic or non-academic staff of any college" from appointment to any position at the college and, therefore, they could not be members of the college staff at the same time. Appellant's husband has been a member of the staff at Brockport since 1964. Because of that fact, she has been denied a "term" appointment to the staff since her marriage, although she has been employed regularly on "temporary" appointment. Appellant contends that the nepotism rule is discriminatory and that the decision of respondent Brown, president of the college and respondent Boyer, Chancellor of the State University, denying her a term appointment for the year 1969–1970 was arbitrary and illegal.

After threading her way through administrative hearings and appeals, appellant has submitted the issue to the courts in an article 78 proceeding. Since her complaint is that denial of her term appointment was based solely upon the nepotism rule which discriminated against her because of sex, she may proceed alternatively before the State Division of Human Rights or review the question in this proceeding (cf. 8 Weinstein-Korn-Miller, N. Y. Civ. Prac., par. 7803.05; *Gaynor* v. *Rockefeller*, 21 A D 2d 92, 97, affd. 15 N Y 2d 120; *Matter of Calzadilla* v. *Dooley*, 29 A D 2d 152).

Appellant became associated with the University as an assistant professor when she was given a "term"[1] appointment in 1963. She resigned that appointment when she planned to marry Dr. Akira Sanbonmatsu. The college has hired her by "temporary"[2] appointments for a period of approximately five and one-half years before institution of this proceeding, the only exception to her regular employment being periods during which she studied for her doctorate and when she left because of a pregnancy. Each "temporary" appointment was given for the academic year commencing with the fall semester and ending with the spring semester and each included promotional increments in salary. At all times during her employment as

---

1. 8 NYCRR 335.5 Title B — Term Appointment
"Definition. A term appointment shall be an appointment for a specified period of not more than three years".

2. 8 NYCRR 335.9 Title C — Temporary Appointment [Now 8 NYCRR 335.11]
"Definition. A temporary appointment shall be an appointment for an unspecified period which may be terminated at any time. Temporary appointments ordinarily shall be given only when the service is to be part-time, voluntary, or to continue for less than one year."

an assistant professor at Brockport, appellant carried a full course load, taught as a full-time staff member and carried full committee and staff responsibilities equal to those of term appointees on the faculty. Because of the nature of her appointments, she has been denied fringe benefits and tenure rights.

In 1969 appellant requested a "term" appointment. This was refused and a "temporary" appointment for the year 1969–1970 was offered by respondent Brown and confirmed in a letter dated May 29, 1969 which stated that "this appointment continues to be temporary in nature in keeping with our nepotism regulations". Having no alternative if she chose to continue her teaching career at Brockport, appellant accepted the appointment. She insists that what she received was a term appointment, that application of the nepotism rule was an illegal denial of her civil rights and that subsequently in February, 1970 when she applied for a maternity leave of absence for the fall semester of 1970 (a benefit accorded to term appointees), her services were illegally terminated.[3] After this termination, appellant applied for a new position and received the recommendation of her department head for the job. Nevertheless, her superior was told to look elsewhere for an appointee because of the "legal conflicts" in appellant's particular case.

It is manifest that the only reason respondents denied appellant membership on the staff was because of the nepotism rule. It has not been claimed that she was not qualified and, in fact, she was a term appointee in 1963 before she married and before she obtained her doctorate. There is substantial evidence in the record which establishes that she is considered by her associates and students alike to be a competent and dedicated teacher.

Quite properly, courts hesitate to substitute their judgment for decisions reasonably arrived at by administrative bodies (*Matter of Lesser* v. *Board of Educ.*, 18 A D 2d 388; *Matter of Fallon* v. *Board of Higher Educ.*, 9 A D 2d 766). But an administrative decision predicated upon an illegal discriminatory rule may not stand and this appeal turns on the legality of the nepotism rule.

Preliminarily, it may be observed that freedom of personal choice in matters of marriage and family life is one of the rights protected by the Fourteenth Amendment to the United States Constitution (*Cleveland Bd. of Educ.* v. *LaFleur*, 414 U. S. 632). Since classifications based upon marital status or familial relationship have little to do with teaching competency,

3. Having been employed for five and one-half years, appellant claims she was entitled to 12 months' notice (8 NYCRR 335.8 [c] [Now 8 NYCRR 335.9(c)]).

one would expect that a nepotism rule which circumscribes employment practices on those grounds would require a powerful rationale to justify its existence.

Be that as it may, the appellant prefers to present her case in the narrower focus that the nepotism rule operates to discriminate against her employment because of her sex (Executive Law, §§ 291, 296, subd. 1). This court has recently had occasion to consider a nepotism rule in *Regional Tr. Serv.* v. *State Division of Human Rights* (43 A D 2d 815). In that case, we confirmed, without opinion, a finding of sex discrimination by the State Division of Human Rights. In the *Regional Tr. Serv.* case, petitioner refused to hire the female complainant, except on a temporary basis, because it claimed she was not qualified and her employment would be contrary to a company policy against hiring employees' wives. It was apparent that the nepotism policy served no reasonable business purpose and was irregularly enforced for the convenience of the company. Our confirmation rested upon the well-established principle that rules which systematically exclude women and serve no job-related purpose are inherently discriminatory (*New York State Division of Human Rights* v. *New York-Pennsylvania Professional Baseball League,* 36 A D 2d 364, affd. 29 N Y 2d 921; *State Division of Human Rights* v. *New York City Dept. of Parks,* 38 A D 2d 25).

What then has been the experience with this nepotism rule? There was evidence at the grievance hearing that there were 27 nepotism cases at Brockport involving husbands and wives. In none of these was the husband required to accept a temporary appointment. The husband received a term appointment and the wife either was temporary or obtained a waiver which permitted her to receive a term appointment.[4] In some instances wives were employed part-time (i.e., truly "temporary" as defined by the rules, *supra,* n. 2) and in the other cases wives worked full time with appointments designated as temporary. In some cases the rule was waived when the University sought to attract a "star" professor to the staff and his wife also wanted to work. In another instance the rule was not applied to a husband hired to teach in the dance department (his wife had a prior term appointment) because the husband and wife were considered a "duo". It is apparent that the rule has been applied unevenly and has resulted in discrimination against

---

4. In five cases no waiver was required because both spouses had term appointments prior to marriage.

women. Witnesses from the college administration candidly admitted as much.

Respondents contend that the rule is justified by the need to avoid collusion by members of the same family unit in voting upon matters presented to the faculty for decision. Just. what those matters might be is not elaborated, but the record does indicate that appellant and other teachers (at. least 11 wives worked in the same department as their husbands) participated in some faculty functions without incident, and the necessity for the rule can be judged by the fact that the University unilaterally decided to do away with it while appellant's proceeding was pending.

The evidence in the record establishes that the nepotism rule was discriminatory, unnecessary and served no job-related purpose.

Special Term did not reach the issue of discrimination because it held that appellant was estopped from questioning the respondents' decision after accepting temporary appointment for 1969–1970.

In proceedings charging discrimination the doctrines of waiver or estoppel rarely rise to the level of cognizable defenses because they have the effect of insulating from accountability the party guilty of discrimination to the detriment of the person wronged. In similar cases it has been held that a teacher may not be held to have waived rights under the Human Rights Law because she acquiesces in or is beneficiary of a labor contract which contains the very discriminatory clause of which she complains (*Camillus Cent. School Dist. No. 1* v. *State Division of Human Rights,* 44 A D 2d 774; see, also, *Matter of Union Free School Dist. No. 6* v. *New York State Division of Human Rights,* 43 A D 2d 31, 36). Nor may an estoppel be used to implement a discriminatory practice which violates public policy as prescribed by statute (*Moncel Realty Corp.* v. *Whitestone Farms,* 188 Misc. 431, affd. 272 App. Div. 899; and see *Alston* v. *School Bd. of City of Norfolk,* 112 F. 2d 992).

An estoppel suggests that appellant, by her wrong, has benefitted herself and harmed an innocent party (see generally 21 N. Y. Jur., Estoppel, § 21). But certainly appellant has not damaged the University because she accepted the only teaching position offered her nor did she enjoy any special advantage as a temporary appointee. She asked for a term appointment and responsibilities equal to a staff member. She was obliged to accept a position with full duties but with the disadvantage of a temporary designation (undoubtedly with concomitant budg-

etary and administrative benefits to the University) because that was the only type of employment available. This is hardly the type of conduct from which estoppels are found.

Respondents' decision to deny appellant a term appointment for the year 1969–1970 was arbitrary because it was based upon the application of an unlawful discriminatory rule. The judgment dismissing the petition should be reversed and judgment entered ordering reinstatement of Dr. Joan Sanbonmatsu as a member of the staff of State University College at Brockport with a term appointment, and the matter is remitted to Supreme Court, Monroe County, for proof of damages.

MARSH, P. J., WITMER, MAHONEY and GOLDMAN, JJ., concur.

Judgment unanimously reversed with costs, petition granted and matter remitted to Supreme Court, Monroe County, for proof of damages.