OPINION OF THE COURT
Fuchsberg, J.
The issue, one of first impression in this court, is whether an amendment to the Human Rights Law (Executive Law, § 296), which adds discrimination attributable to an individual’s “marital status” to its roll of interdicted employment practices, is violated by an employer’s anti-nepotism rule.[1] Entitled “employment policy”, the rule, promulgated in a bulletin by the employer, Manhattan Pizza Hut, Inc., operator of a nationwide chain of fast food restaurants, would forbid an employee from working under the supervision of a relative, a term announced to include a spouse, a parent, a sibling or an offspring.[2]
*510 The appeal which raises this question arrives in the following factual and procedural context: Carol S. Dammann had been employed for about four years under the direct supervision of her husband, Harold Dammann, a manager of one of the Pizza Hut establishments, when, at the instance of Andrew Halatyn, a new area general manager who, seemingly sweeping with his new brush, decided to enforce his company’s no-relatives policy. As a consequence, Ms. Dammann’s employment was terminated. The sole focus[3] ,of the complaint she subsequently filed with the State Human Rights Division against Pizza Hut and Mr. Halatyn was discrimination by reason of “marital status”. Following a public hearing, the division upheld her position and issued an order restoring her to her former job and awarding back pay and compensatory damages. The order having been affirmed by the Human Rights Appeal Board, Pizza Hut and Mr. Halatyn, pursuant to section 298 of the Executive Law sought review in the Appellate Division, which, in turn, confirmed the order.
On the present appeal, as in the tribunals below, the dispute between the parties centers on the meaning of the phrase “marital status”. Here, as there, the parties urge opposing interpretations of the term “marital status”, giving rise to a new class of cases the amendment was designed to protect from discriminatory treatment.
Pizza Hut submits the phrase denotes the particular relation an individual bears to the marital state rather than to a particular marital partner. In that perspective, one’s “marital status” would be that phase of his or her personal lifestyle which is classifiable, for instance, as single, married, separated, divorced or widowed. As applied, this would *511 mean that it would be unlawful for an employer to base a decision to hire or fire or otherwise distinguish among its employees because they answer to one of these descriptions, rather than another. In contrast, it would not prevent the employer from doing so because of who the spouse of the employee is or what that spouse does.
The Human Rights Division’s position, on the other hand, is that “marital status” looks beyond the individual’s conjugal state to embrace the identity or situation of the individual’s spouse. Its more expansive definition would widen the scope of the phrase to encompass not only the individual but also the particular circumstances which condition that individual’s spousal relationships. Whatever might be said for or against the wisdom behind a statute which articulated either of these views, for the ensuing reasons, our analysis of the amendment and its legislative history leads us to the conclusion that the position of the employer is correct.
Before we undertake our analysis, we note that our task is not complicated by any evidence that the company’s policy, though facially neutral, results in discrimination because of a disparate impact on a particular group of persons (cf. Matter of Sanbonmatsu v Boyer, 39 NY2d 914, affg 45 AD2d 249; State Div. of Human Rights v Kilian Mfg. Corp., 35 NY2d 201, app dsmd 420 US 915; Dothard v Rawlinson, 433 US 321). Nor are we here confronted by evidence of uneven application (cf. Matter of Sanbonmatsu v Boyer, 39 NY2d 914, affg 45 AD2d 249, supra).
This said, we now call upon the obvious and fundamental rule of construction that words of common usage are to be given their ordinary meaning (Matter of Common Council of City of Gloversville v Town Bd. of Town of Johnstown, 37 AD2d 459, revd on other grounds 32 NY2d 1; see, also, McKinney’s Cons Laws of NY, Book 1, Statutes, § 94). So tested, the plain and ordinary meaning of “marital status” is the social condition enjoyed by an individual by reason of his or her having participated or failed to participate in a marriage. Illuminated another way, when one is queried about one’s “marital status”, the usual and complete answer would be expected to be a choice among “married”, “single”, *512 etc., but would not be expected to include an identification of one’s present or former spouse and certainly not the spouse’s occupation.
But we need not rest on this general rule of construction alone. The memorandum attached to the bill as it was passed by the Legislature is in accord. It informs us that its purpose “is to extend the jurisdiction of the New York State Division of Human Rights to complaints of discrimination resulting * * * from the status of divorced, separated, widowed or single persons, or from other status related to marriage” (NY Legis Ann, 1975, p 65). This enumeration of what kind of status is intended by “marital status” leaves nothing to the imagination. Each of the categories it uses to illustrate “marital status” — “divorced, separated, widowed or single” — indisputably emphasizes the individual’s status and not that of any present or former partner who, in any particular circumstance and at any given time (by dint of remarriage, for instance), may very well have a different status from that of his or her former spouse.
And the final disjunctive phrase, “from other status related to marriage”, makes for a classical case in which to apply the principles of ejusdem generis. An interpretive device fashioned to save draftsmen from undertaking the hazard of spelling out in advance every contingency to which a statute would have been intended to apply (see People v Klose, 18 NY2d 141, 145), that doctrine yet imposes the understanding that general phraseology will be taken to have been “limited * * * by the specific words which precede it” (People v Illardo, 48 NY2d 408, 416). Applied here, it means that the statute in effect says that employers may no longer decide whether to hire, fire, or promote someone because he or she is single, married, divorced, separated or the like. Had the Legislature desired to enlarge the scope of its proscription to prohibit discrimination based on an individual’s marital relationships — rather than simply on an individual’s marital status — surely it would have said so.
Confirmation of our reading of the legislative intent is also to be found in what the statute and its history omits as well as what it includes. The importance of the business *513 and labor management concerns it seeks to serve belies the likelihood that the Legislature would have struck a blow at antinepotism policies with nary a word, in or out of the statute, to express or explain its intention, whether for the guidance of the Human Rights Division or, for that matter, for the information of the sophisticated employers who surely would have wanted their opinions heard.
The point becomes especially clear when we regard the benefits which their supporters see in antinepotism rules. As they put it, the thrust of such practices is to avoid favoritism, be it actual or apparent or conscious or unconscious, when two close relatives work together, all the more so in a supervisor-supervisee capacity. Possibilities for conflict in such circumstances of course come readily to mind: e.g., evaluation of a supervisee’s performance, exercise of discretion in enforcing work rules, allocation of work assignments, settlement of disputes among employees, recommendations for promotions. Indeed, an easy illustration may be found in this very case: Mr. Halatyn, operating within the company chain of command, as area general manager, instructed the husband here, as store unit manager, to notify his wife that she would be terminated because of the anti-nepotism rule; Mr. Dammann having failed to do so for a month, Mr. Halatyn had to take the matter into his own hands. Moreover, as could be pointed out with at least some cogency, even where a supervisor makes prodigious and even successful efforts to be evenhanded, the perception that he or she may have been influenced by a close relationship with a supervisee may tend to undermine morale and efficiency (see Keckeisen v Independent School Dist., 509 F2d 1062, 1066). There is nothing to indicate that considerations other than these were behind Pizza Hut’s rule. When issued, it was accompanied by a simple statement that its purpose was “[t]o prohibit employment relationships which can cause problems for the Company or for individuals”.
As against these perfectly rational motivations, the dissent’s fear that antinepotism rules will discourage marriage and encourage divorce, and thus undermine the freedom of persons to marry, seems, to say the least, farfetched. Indeed, *514 some with a practical bent might think that the pressures of employment supervision by one spouse or other close relative over another, if anything, would add rather than detract from the normal tensions of an already close and somewhat consuming relationship. In any event, given the societal, religious, romantic and practical support arrayed behind the marriage institution, it is inconceivable that it would not withstand the fact that some employers believe close relatives are not the preferred choice for supervisors of one another. Moreover, in an age when sociological statistical studies abound, it is not without significance that no empirical proof to demonstrate that the claimed institutional effect is real was ever presented to the Human Rights Division.
Now, given the parameters of the term “marital status” as used in our statute, there remains only the application of its meaning to the facts before us. There is no proof that Carol Dammann was discharged because she was married. So far as the record shows, had Ms. Dammann been married to a person other than to a supervisor employed in the same “pizza hut”, she would not have been discharged. The company’s policy simply implemented its conviction that the employment of relatives where one would exercise supervisory authority over the other was undesirable. In sum, the disqualification of the complainant was not for being married, but for being married to her supervisor.
Hence, we hold that Ms. Dammann was not discriminated against on the basis of marital status within the intendment of section 296 of the Executive Law.[4] It follows that the order of the Appellate Division should be reversed and the order of the State Human Rights Appeal Board annulled.

. As amended, section 296 of the Executive Law provides: “1. It shall be an unlawful discriminatory practice: (a) For an employer or licensing agency, because of the age, race, creed, color, national origin, sex, or disability, or marital status of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual, or to discriminate against such individual in compensation or in terms, conditions or privileges of employment” (emphasis added).

. In pertinent part, the text of the policy statement is as follows:
“I. Employee [s] are not permitted to work in a position where their supervisor or their supervisor’s supervisor is a relative.
“II. The term ‘relative’ shall apply, but not be limited to, the following relationships, whether established by blood, marriage, or other legal actions: Father, Mother, Brother, Sister, Husband, Wife, Son, Daughter, Grandfather, Grandmother, Grandson, Granddaughter.
“III. Where such situations exist through promotion, transfer or marriage, action will be taken to transfer or to terminate one of the employees within a two (2) month period after the relationship is determined or established. No capable and conscientious employee should be terminated if a transfer is possible.”

. Although Mr. Halatyn apparently had taken no steps to effect an intracompany transfer of Ms. Dammann under paragraph III of the rule, he soon after informed her that he had misinterpreted company policy and volunteered this alternative to termination. However, she rejected the offer on the ground that, though her scale of pay would not he lowered, considerations of seniority would make it less likely that she would win ultimate promotion at the new store than at the old one. In any event, nothing turns on these added facts, especially since the Human Eights Division has no authority to control irregular application or enforcement of an employment policy unless it involves discrimination on proscribed statutory grounds, which, as we shall see, was not the case here.

. Since we thus hold that the employer’s policy, even as applied to spouses, does not run afoul of the statutory injunction agaitist marital status discrimination, the result is not altered by the fact that the employer in the past had not enforced its policy against Ms. Dammann.