930 P.2d 307 (1997)
131 Wash.2d 171
Kathryn A. MAGULA, Respondent,
v.
BENTON FRANKLIN TITLE COMPANY, INC., Petitioner.
No. 63318-5.
Supreme Court of Washington, En Banc.
Argued May 16, 1996.
Decided January 30, 1997.
*308 Rettig, Osborne, Forgette, O'Donnell & Iller, Diehl R. Rettig, Brian J. Iller, Kennewick, for petitioner.
Shea & Kuffel, Edward F. Shea, Timothy G. Klashke, Pasco, Jacqueline J. Shea, Bellevue, for respondent.
TALMADGE, Justice.
Kathryn Magula was discharged after 14 years of employment because of the alleged misconduct of her spouse, an independent contractor for the same firm. Although RCW 49.60.020 proscribes discrimination *309 based on marital status and RCW 49.60.180 declares marital status discrimination to be an unfair practice, a definition of "marital status" did not appear in our Law Against Discrimination at the time of the events in this case. Magula contends marital status discrimination includes action against an employee based on the conduct of that employee's spouse. Magula's employer contends marital status discrimination is confined to action based on the institution of marriage itself.
In this case, we hold marital status discrimination may pertain to situations where the identity and conduct of the employee's spouse are involved. We affirm the Court of Appeals and remand this case to the Benton County Superior Court for further proceedings.

ISSUES
1. Where an employee is discharged for reasons unrelated to the employee's performance and because of the alleged conduct of the employee's spouse, does such a discharge constitute marital status discrimination?
2. Did the trial court properly grant Benton Franklin Title Insurance Co.'s (BFT) motion for summary judgment?

FACTS
BFT hired Kathryn Magula in 1978. By 1991, she had become the head of the firm's escrow department. During this period, her husband, Pat Magula, provided janitorial services for BFT as an independent contractor.
In the fall of 1991, Kathryn Magula perceived tension in the office and the animosity of fellow employees. On November 20, 1991, she took escrow department employee Linda Hendler out to lunch and asked why their relationship was so tense and strained. Hendler told Kathryn it was the Magulas' fault another employee had been fired the month before and that Pat Magula was having or had had affairs with several women at the office. She also stated other employees thought he "did not live life by the rules." Clerk's Papers at 456. Kathryn was greatly distressed by this conversation, which she reported to her supervisor, BFT manager Greg Bowers. Bowers began to keep a diary of office events.
The next day, Hendler informed Bowers Pat Magula had made a threatening phone call to her, and had followed her and her daughter to school. Hendler's ex-husband, Jeff, told Bowers he was concerned for the safety of Linda and their children. Linda Hendler obtained a restraining order against Pat Magula.
Kathryn Magula admitted in her deposition there was animosity in the office during this period. She indicated the conversation with Hendler made their already strained relationship even worse. Bowers testified the conflict between Linda and Kathryn adversely affected their performance in the escrow department, although he did not record any specific incidents of Kathryn's negative office performance in his diary. Bowers told Kathryn, Linda, and Pat the situation was no-win for all concerned, and was adversely affecting BFT. He told them unless everyone could rise above the interpersonal conflict and work together, he would dismiss all parties involved. To ensure compliance with the restraining order Hendler had obtained against Pat Magula, Bowers also told Pat not to come to BFT any more.
On December 9, 1991, Hendler reported to Bowers she was upset and unable to work because Pat Magula had telephoned her and made obscene suggestions. She also said her friends had seen comments freshly written on several men's restroom walls in clubs in the area stating she had HIV. Hendler attributed the graffiti to Pat Magula.
Bowers believed this news was a "crushing blow" to the possibility Kathryn and Linda could work together. Clerk's Papers at 431. On December 10, he met with Pat Magula and said he "would not judge who is right or wrong" in the accusations, but he terminated BFT's contract with Pat. Id. at 62. Bowers met separately with Kathryn and Linda and terminated their employment because he did not think they could work together.
Kathryn sued BFT, asserting BFT breached express and implied promises of employment, committed the tort of outrageous conduct, or wrongfully discharged her in violation of public policy as set forth in *310 RCW 49.60, including marital status discrimination under RCW 49.60.180. BFT moved for summary judgment, arguing its action did not involve marital status discrimination because the discharge did not turn on Kathryn's marriage or the identity of her spouse. However, BFT did not address the issue of whether Magula's discharge was a "business necessity" within the meaning of WAC 162-16-150. Kathryn argued marital status discrimination includes being discharged for the misconduct of a spouse, and admitted Pat Magula had engaged in misconduct. Report of Proceedings at 9-15.
The trial court granted summary judgment for BFT on all claims, stating firing someone because of the conduct of the spouse was not marital status discrimination. On appeal, the Court of Appeals, Division Three, affirmed the trial court's rulings on all other claims, but reversed and remanded as to the marital status discrimination claim, stating the evidence created an issue as to whether Ms. Magula was terminated based on her spouse's conduct:
The record discloses that the circumstances surrounding termination of Ms. Magula's employment related to allegations of misconduct by her husband. There are no allegations of misconduct by Ms. Magula. The evidence creates a genuine issue of fact whether Ms. Magula was discriminated against based on who her spouse was, his conduct or what he did.
Magula v. Benton Franklin Title Ins. Co., 79 Wash.App. 1, 4, 901 P.2d 313 (1995). We granted review.[1]

ANALYSIS
A. Marital Status
A prima facie case of marital status discrimination requires a plaintiff to prove "(1) that the employer discriminated against her based on her marital status and (2) that this discrimination was not justified or excused by `business necessity'." Kastanis v. Educational Employees Credit Union, 122 Wash.2d 483, 493, 859 P.2d 26 (1993), amended, 122 Wash.2d 483, 865 P.2d 507 (1994). Marital status must be a substantial factor in the employer's adverse employment decision. Mackay v. Acorn Custom Cabinetry, Inc., 127 Wash.2d 302, 310, 898 P.2d 284 (1995). The parties have focused solely on the definition of "marital status"; Magula has not addressed, nor has BFT argued at this point in the case, whether Magula's termination was a "business necessity."[2]
It is unlawful for any employer to discharge a person from employment "because of ... marital status." RCW 49.60.180. See also RCW 49.60.010, .020. The Legislature added marital status to the list of protected attributes in RCW 49.60 in 1973, but provided no definition of the term "marital status." Laws of 1973, ch. 141, § 10. In 1993, the Legislature defined "marital status," as "the legal status of being married, single, separated, divorced, or widowed." Laws of 1993, ch. 510, § 4.
Prior to 1993, Washington law employed a broad definition of "marital status" under RCW 49.60. Although RCW 49.60 did not define "marital status," the Human Rights Commission promulgated WAC 162-16-150 in 1975, defining marital status discrimination. WAC 162-16-150(2) specifically provides:
In general, discrimination against an employee or applicant for employment because of (a) what a person's marital status *311 is; (b) who his or her spouse is; or (c) what the spouse does, is an unfair practice because the action is based on the person's marital status.
(Emphasis added.) Generally, administrative agency interpretations of statutes are given great weight. Doe v. Boeing Co., 121 Wash.2d 8, 15, 846 P.2d 531 (1993) (RCW 49.60 does not define "handicap"; deference is given by court to Human Rights Commission administrative rule defining "handicap").
Subsequent court decisions essentially adopted the view of the Human Rights Commission that marital status under RCW 49.60 involves conduct beyond the mere legal status of being married or single, and may include discrimination based on the status of being married or single and conduct of the employee's spouse. We held an antinepotism policy could constitute marital status discrimination and specifically approved the interpretation of "marital status" adopted by the Human Rights Commission in WAC 162-16-150 in Washington Water Power Co. v. Washington State Human Rights Comm'n, 91 Wash.2d 62, 69, 586 P.2d 1149 (1978),:
We think the commission was justified in its interpretation of the policy and purpose of the act, when it concluded that the legislature did not intend to restrict its coverage to cases where the employer refuses to hire any married personor any unmarried person. The fact that the commission was given broad policy formulation and rule making powers indicates a legislative recognition that all of the circumstances in which discrimination might exist and all of the forms which it might take were not then known and could not be anticipated, and that the diligence and expertise of an administrative agency were needed to achieve the purpose intended in the statute.
When read in the light of the entire statute, the provision which makes it an unfair practice to refuse to hire any person "because of such person's ... marital status" is broad enough in its import to cover the situation involved here.
Indeed, in Levinson v. Washington Horse Racing Comm'n, 48 Wash.App. 822, 826, 740 P.2d 898 (1987), the Court of Appeals held the automatic disqualification of a license applicant based on the spouse's prior conviction for possession of controlled substances infringed on the constitutional right to marry.
Most recently, in Kastanis v. Educational Employees Credit Union, 122 Wash.2d 483, 859 P.2d 26 (1993), amended, 122 Wash.2d 483, 865 P.2d 507 (1994), we again approved the definition of "marital status" contained in WAC 162-16-150: "The meaning of marital status as used in RCW 49.60.180 is not limited to conditions such as being married, single, or divorced, but also applies to antinepotism policies based on the identity of an employee's or applicant's spouse." Kastanis, 122 Wash.2d at 488, 859 P.2d 26. We also noted, however, the 1993 amendments to RCW 49.60.040 were not before the court. Id. at 488 n. 3, 859 P.2d 26. See also European Health Spa v. Human Rights Comm'n, 212 Mont. 319, 687 P.2d 1029 (1984) (illegal for female employee who engaged in no misconduct to be fired because of husband's misconduct).
However, in the context of insurance policies whose provisions are subject to RCW 48.30.330, which forbids marital status discrimination in insurance contracts, a somewhat more limited approach to marital status discrimination has been evident. In State Farm General Ins. Co. v. Emerson, 102 Wash.2d 477, 687 P.2d 1139 (1984), we declined to invalidate an insurance policy provision that excluded bodily injury to the resident spouse or other resident relative of the named insured. The court found the exclusion of injury to any and all resident family members was crucial, for it indicated the exclusion was not directed at or closely related to the institution of marriage.
In Edwards v. Farmers Ins. Co., 111 Wash.2d 710, 763 P.2d 1226 (1988), we analyzed marital status discrimination under RCW 48.30.330, and adhered to a broad interpretation of the marital status discrimination statute, stating marital status discrimination goes beyond the "employee's bare marital status" and includes "the identity and occupation of his or her spouse," so that a typical antinepotism policy constitutes marital status discrimination. Edwards, 111 Wash.2d at 710, 763 P.2d 1226; Washington *312 Water Power, 91 Wash.2d at 68-69, 586 P.2d 1149.[3]
The difficult cases, the Edwards court explained, are those involving mixed factors, where the discrimination is based on the plaintiff's marital status and another qualifying factor. For example, an antinepotism policy turns on the employee's marriage and the identity or occupation of the employee's spouse as an employee of the same employer.
However, Edwards indicated even this broad approach has a limit and not all mixed cases will constitute marital status discrimination. To determine where to draw the line, Edwards adopted the reasoning of Cybyske v. Independent Sch. Dist. No. 196, 347 N.W.2d 256 (Minn.1984), cert. denied, 469 U.S. 933, 105 S.Ct. 330, 83 L.Ed.2d 266 (1984). There, the court held a refusal to hire because of the views of an applicant's spouse did not constitute discrimination, because the alleged reason for the employer's action was not directed at the institution of marriage itself, "at least not with the same directness and closeness" as in the case of a policy barring employment of a spouse of an employee. Cybyske, 347 N.W.2d at 261.
Edwards stated the "[t]he same is true in Washington." Edwards, 111 Wash.2d at 719, 763 P.2d 1226. Under Edwards, discrimination based on conduct of a spouse is marital status discrimination only where the adverse employment action turns specifically on marital status or, to put it another way, where the employer's action is more closely related to the plaintiff's marriage than to the spouse's conduct.
The Edwards court relied on that reasoning in considering the legality of an antistacking provision applied only to a policy of a resident spouse, and not to policies of any other family members or other co-residents of the named insured. As a result, the Edwards court found the policy provision was prohibited because it turned specifically on the marriage, and was "more closely analogous to the classification found to be discriminatory in Washington Water Power" than to the other factor of holding a policy while living with the named insured. Edwards, 111 Wash.2d at 719-20, 763 P.2d 1226.
BFT invites us to apply the ostensibly narrower definition of "marital status" found in Edwards and cases like Cybyske, arguing this is more consistent with the intent of the Legislature in its 1993 amendment to RCW 49.60.040. We decline to do so. The parties in Edwards did not argue and the Court did not consider the applicability of WAC 162-16-150. Thus, Edwards has no effect whatsoever on the vitality of our holding in Washington Water Power with respect to the regulation. While the 1993 amendment to RCW 49.60.040 may apply to cases arising after the effective date of the amendments and may alter the administrative definition of WAC 162-16-150, that issue is not now before us. Our precedents constrain us to employ WAC 162-16-150 to define marital status discrimination, just as we have done twice before. Kastanis, 122 Wash.2d at 488, 859 P.2d 26; Washington Water Power Co., 91 Wash.2d at 68, 586 P.2d 1149.[4]
*313 While the parties have referenced the 1993 legislative amendment to RCW 49.60.040(7), which defined marital status as "the legal status of being married, single, separated, divorced, or widowed," Laws of 1993, ch. 510, § 4, they have not adequately discussed the applicability of the 1993 amendment to the events in this case, which occurred in 1991. Generally, an amendment applies prospectively only. In re F.D. Processing, Inc., 119 Wash.2d 452, 832 P.2d 1303 (1992); Landgraf v. USI Film, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). However, an amendment may apply retroactively if it is curative or remedial and intended to clarify rather than change the law. Tomlinson v. Clarke, 118 Wash.2d 498, 510-11, 825 P.2d 706 (1992). An amendment is curative if it clarifies or technically corrects an ambiguous, older statute, without changing prior case law. F.D. Processing, 119 Wash.2d at 461, 832 P.2d 1303, Washington Waste Sys., Inc. v. Clark County, 115 Wash.2d 74, 78, 794 P.2d 508 (1990). Any attempt by the Legislature to contravene retroactively this Court's construction of a statute "is disturbing in that it would effectively be giving license to the [L]egislature to overrule this [C]ourt, raising separation of powers problems." Johnson v. Morris, 87 Wash.2d 922, 926, 557 P.2d 1299 (1976). Accord, Overton v. Washington State Economic Assistance Auth., 96 Wash.2d 552, 558, 637 P.2d 652 (1981). The Legislature did not expressly make the 1993 amendment retroactive. The 1993 amendment must be applied only prospectively because if the change is substantive, the general rule of prospective application applies; if the change is merely curative, prior Washington law is unaffected.
In summary, under Washington law prior to the 1993 legislative amendment to RCW 49.60.040, marital status discrimination was not confined to discrimination involving the institution of marriage itself, but more broadly related to marital status and spousal conduct. That definition encompasses the facts here.
B. Was Summary Judgment Proper?
In a summary judgment motion, the moving party bears the burden of demonstrating an absence of any genuine issue of material fact and entitlement to judgment as a matter of law. Young v. Key Pharmaceuticals, Inc., 112 Wash.2d 216, 225, 770 P.2d 182 (1989). Thereafter, the nonmoving party must set forth specific facts evidencing a genuine issue of material fact. The trial court considers the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. The appellate court reviews the trial court's decision de novo. Fell v. Spokane Transit Auth., 128 Wash.2d 618, 625, 911 P.2d 1319 (1996); Mountain Park Homeowners Ass'n, Inc. v. Tydings, 125 Wash.2d 337, 341, 883 P.2d 1383 (1994). Viewing facts and inferences in a light most favorable to Magula, we find an issue of fact as to whether BFT's discharge of Kathryn Magula was related to her marital status.
When BFT terminated her employment, it indicated Kathryn Magula was not accused of misconduct. The trial court specifically found no misconduct by Kathryn Magula in its order on summary judgment. Nothing in Greg Bowers' journal suggested Kathryn Magula engaged in any misconduct prior to her December 10, 1991 termination. Linda Hendler did not accuse her of misconduct. Moreover, nothing in Bowers' journal indicated Magula performed her duties at BFT at less than an acceptable level. She was not disciplined by BFT. Accordingly, it would appear her being married to Pat Magula, who engaged in alleged misconduct with Linda Hendler and other female BFT staff, was the basis for BFT's action. BFT made no effort to assess the conduct or performance of Kathryn Magula as an individual. Taking the facts and inferences from the facts in a light most favorable to Kathryn Magula, her discharge occurred because of the conduct of her spouse, and thus, it is for the trier of fact to determine whether BFT's action was marital status discrimination for purposes of a prima facie case under RCW 49.60.020.
At trial, Magula retains the burden of proving her discharge was not the result of a business necessity. BFT may argue the immediate motivating factor for its decision was the apparent inability of Kathryn Magula and Linda Hendler to work with each other. *314 BFT may also argue the dismissal was based on the disruption in BFT's workplace, and that, in an even-handed fashion, it also terminated the employment of the person involved in the animosity who was not married to Pat Magula. Such contentions are appropriately addressed to whether Magula presented a prima facie case that business necessity was not the basis for her firing.

CONCLUSION
Our Law Against Discrimination is designed to forestall invidious treatment of employees on the basis of race, sex, marital status, national origin, or disability without consideration of individual conduct and performance; this is the essence of discrimination.
There is sufficient evidence that a discharge based not upon Kathryn Magula's individual merits or demerits, but rather upon Kathryn Magula "the wife of Pat Magula," may give rise to a claim of marital status discrimination under RCW 49.60 as it existed prior to 1993. We affirm the Court of Appeals' decision and remand the case for further proceedings consistent with this opinion.
DOLLIVER, SMITH, GUY and JOHNSON, JJ., concur.
ALEXANDER, Justice (concurring).
I concur in the decision of the majority. I do so despite my agreement with Justice Sanders's dissenting opinion that the plain meaning of the phrase "marital status" encompasses only the "status of being married or unmarried," and does not extend to a person's spouse or what one's spouse does. Dissenting op. at 315. In addition, I agree with his assertion that we need not defer to an administrative agency's interpretation of a statute if it contravenes the plain meaning of the statute.
My decision to concur is compelled, however, by our holding in Washington Water Power Co. v. Washington State Human Rights Comm'n, 91 Wash.2d 62, 69, 586 P.2d 1149 (1978). In that case, we approved the Human Rights Commission's definition of marital status discrimination, a definition that accords with Magula's contention that a termination due to the actions of one's spouse constitutes marital status discrimination. Because this court is not inclined to overrule Washington Water, and, in my opinion, it cannot be distinguished, principles of stare decisis require us to accept the interpretation of marital status discrimination that is found in that decision. Moreover, although the dissent suggests that we may look to the 1993 amendment of RCW 49.60 to determine that statute's original meaning, I do not believe that our interpretation of "marital status" was, as the dissent suggests, ambiguous prior to 1993. I therefore agree with the majority that the 1993 amendment may not be given retroactive effect.
I concur in the decision of the majority.
DURHAM, Chief Justice (concurring in part, dissenting in part).
I agree with the majority that marital status discrimination can be implicated when people are terminated because of the conduct of their spouses. Therefore, I concur in that part of the majority opinion that construes the definition of "marital status" for purposes of RCW 49.60.180.
I disagree, however, with the majority's conclusion that a question of fact exists as to whether the decision to terminate Kathryn Magula was related to her marital status or to her husband's conduct. Kathryn Magula's termination was unrelated to her marital status. She was terminated because she was one of a group of employees put on probationary status because of their difficulties getting along in the workplace. The supervisor informed the three individuals they would all be fired if the problems persisted. All three were subsequently fired because of Mr. Magula's conduct.
The dispositive termination criterion was that one of this identified group perpetuated the conflict. Thus, Magula's termination did not turn on her marital status and summary judgment should be granted in favor of Benton Franklin Title Company. Therefore, I dissent to that part of the majority opinion which remands for consideration of the issue.
*315 SANDERS, Justice (dissenting).
The majority gives its blessing to a definition of "marital status" that contradicts the plain meaning of those words. Its decision is little more than a rewriting of the statute after the Legislature had amended it to make its original intention crystal clear. I dissent.
The goal of statutory construction is to give effect to the intent of the Legislature. Kadoranian v. Bellingham Police Dept., 119 Wash.2d 178, 185, 829 P.2d 1061 (1992). If a statute is clear on its face, however, it is not subject to judicial interpretation. In re Marriage of Kovacs, 121 Wash.2d 795, 804, 854 P.2d 629 (1993). "If the language of the statute is amenable to more than one construction, however, resort to legislative history and other aids to construction is appropriate." Kadoranian, 119 Wash.2d at 185, 829 P.2d 1061. In construing an ambiguous statute, we may look to the purpose and history of the statute for guidance in interpreting the language used. Id. By each of these criteria, the majority has defeated legislative intent.

PLAIN MEANING
An analysis of the plain meaning of "marital status" is straightforward: marital status means the status of being married or unmarried. I suspect one would be hard pressed to find a person outside of the Human Rights Commission who, when asked to define "marital status," would reply, marital status means "(b) who [an employee's] spouse is" or "(c) what the spouse does" (quoting WAC 162-16-150(2)).
Courts in other jurisdictions have applied the plain meaning of "marital status." The Alaska Supreme Court recently defined the concept as "the actual condition of being married or unmarried" and concluded "[t]he term refers only to the state of being married, and does not extend to include the identity of the person to whom one is married." Muller v. BP Exploration (Alaska), Inc., 923 P.2d 783, 788 (Alaska 1996). The Supreme Court of Michigan examined whether "one is married rather than to whom one is married." Miller v. C.A. Muer Corp., 420 Mich. 355, 362 N.W.2d 650, 653, 44 A.L.R.4th 1035 (1984). The Court of Appeals of New York defined "marital status" as "the social condition enjoyed by an individual by reason of his or her having participated or failed to participate in a marriage...." Manhattan Pizza Hut, Inc. v. Human Rights Appeal Bd., 51 N.Y.2d 506, 511, 415 N.E.2d 950, 953, 434 N.Y.S.2d 961, 964 (1980). The Appellate Division of the New Jersey Superior Court concluded "an employer may not base his decision to hire, fire, promote, etc., on the fact that an individual is either married or single." Thomson v. Sanborn's Motor Express, Inc., 154 N.J.Super. 555, 382 A.2d 53, 56 (1977). In Maryland, the relevant inquiry was "whether one is married or not married." Maryland Comm'n on Human Relations v. Greenbelt Homes, Inc., 300 Md. 75, 475 A.2d 1192, 1196 (1984).
When one is asked about one's marital status, "the usual and complete answer would be expected to be a choice among `married', `single', etc., but would not be expected to include an identification of one's present or former spouse...." Manhattan Pizza Hut, 434 N.Y.S.2d 961, 415 N.E.2d at 953. If we ask the question here, the answer for Kathryn Magula would be expected to be "married," not "the wife of Pat Magula." See Majority op. at 314. The plain and ordinary meaning of the term "marital status" clearly does not encompass the identity of one's spouse.

LEGISLATIVE HISTORY
Although I believe the meaning of the term "marital status" is clear, let us assume arguendo that one could somehow find such simple words ambiguous. A review of the legislative history of HB 404, which amended RCW 49.60 in 1973 to include "marital status," shows no indication whatsoever that the Legislature ever intended such a bizarre definition as the majority would impose. Indeed, the main purpose for adding "marital status" to our antidiscrimination laws was to remedy situations, especially in credit and insurance transactions, where "women, particularly those separated, divorced or widowed, have received much discrimination," and to "provide women, regardless of marital status, rights and responsibilities equal to those held by men." Letter dated February 13, 1973, from Jocelyn Marchisio, President, *316 League of Women Voters of Washington to Rep. Lorraine Wojahn, Chairman, Committee on Commerce (internal quotations omitted) (emphasis added). Protecting employees from the consequences of the misdeeds of their spouses simply was not a concern.
By the majority's definition, the first prong of a claim of unlawful discrimination would be satisfied if a bank fired the spouse of a bank robber. Such a bold gesture of egalitarianism would have, one would think, warranted some discussion amongst the legislators considering HB 404. Yet there is nothing. "Confirmation of our reading of the legislative intent is also to be found in what the statute and its history omits as well as what it includes." Manhattan Pizza Hut, 434 N.Y.S.2d at 964, 415 N.E.2d at 953. There is little likelihood that the Legislature would have made such a dramatic gesture "with nary a word, in or out of the statute, to express or explain its intention...." Id. The legislative history of this bill demonstrates the majority's definition goes well beyond what the Legislature intended.

STATUTORY PURPOSE
The purpose of antidiscrimination laws "is to prevent prejudices and biases borne against persons who are members of certain protected classes; [the laws] seek[] to eliminate the effects of offensive or demeaning stereotypes, prejudices, and biases against the members of those classes."[1]Muller, 923 P.2d at 790. "Civil rights acts seek to prevent discrimination against a person because of stereotyped impressions about the characteristics of a class to which the person belongs." Miller, 362 N.W.2d at 653. In short, antidiscrimination statutes are designed to prevent discrimination against people on the basis of their class status. "[The civil rights movement's] mission today is defined not in terms of any overall standard of social welfare that takes into account the preferences and desires of all persons within society, but solely in terms of the various classes of protected parties." Richard A. Epstein, Forbidden Grounds: The Case Against Employment Discrimination Laws 501 (1992) (emphasis added). The defendants in the present case fired the plaintiff after allegations of loutish and threatening conduct against the plaintiff's co-workers by the plaintiff's husband. The reasons for the plaintiff's dismissal are wholly unique to her. To accept the majority's reasoning contradicts RCW 49.60.180's goal of protecting class members from prejudices and biases borne against them based on their status as a married or nonmarried person.
While being married is a class-defining factor, being married to Pat Magula is not. "Extending the reach of the anti-discrimination law to employment decisions based on to whom a person is married would change the focus of the law from discrimination based on broad categories, which can give rise to demeaning stereotypes and biases, to a highly individual factor." Muller, 923 P.2d at 791. Confining the definition of marital status to the condition of being married or unmarried best serves the purpose of this state's anti-discrimination laws because it confines the statute's focus to preventing offensive and demeaning stereotypes. The majority's highly personalized reading of the statute therefore runs contrary to the goals embodied in our antidiscrimination laws.

DEFERENCE TO AGENCY DEFINITION
The majority deferred to the interpretation of "marital status" adopted by the Human Rights Commission and thereby abdicated its judicial responsibility to apply and interpret the statute if necessary. Agency definitions, however, do not justify such deference when they are contrary to a statute's language, legislative history, and purpose. *317 See Muller, 923 P.2d at 792. "[I]t is ultimately for the court to determine the purpose and meaning of statutes, even when the court's interpretation is contrary to that of the agency charged with carrying out the law." Overton v. Washington State Economic Assistance Auth., 96 Wash.2d 552, 555, 637 P.2d 652 (1981). Unelected, unaccountable administrative agencies should not be allowed to rewrite statutes to achieve goals not embodied in the legislation they purport to interpret. See Boaden v. Department of Law Enforcement, 171 Ill.2d 230, 215 Ill.Dec. 664, 668, 664 N.E.2d 61, 65 (1996) (refusing to grant deference to erroneous agency definition of "marital status").
This is not the first time this court has considered the Human Rights Commission rules under this statute. Washington Water Power Co. v. Washington State Human Rights Comm'n, 91 Wash.2d 62, 69, 586 P.2d 1149 (1978). While I believe the Supreme Court of Appeals of West Virginia overstated the case when it called that decision "eccentric," Townshend v. Board of Educ., 183 W.Va. 418, 396 S.E.2d 185, 190 n. 4 (1990), Washington Water Power Co. is nevertheless quite distinguishable. Washington Water Power considered an employer's antinepotism policy which flatly prohibited hiring a spouse simply because of the spouse's "marital status"; that is to say, any spouse is ineligible for employment not because of any personal trait of either spouse but because the spouse is married to an employee. Here, however, both spouses were discharged because of the personal conduct of the husband, not as the result of a policy based on marital status. Antinepotism policies are class-based and focus on an aspect of marital status.

CHANGE IN THE STATUTE
The majority also holds that the 1993 amendment to RCW 49.60.040(7), which defines "marital status" as "the legal status of being married, single, separated, divorced, or widowed," applies prospectively only. This conclusion is based on its finding that "[u]nder Washington law prior to the 1993 legislative amendment to RCW 49.60.040, marital status discrimination was not confined to discrimination involving the institution of marriage itself...." Majority op. at 313. However, this finding ignores the fact, recognized by the majority elsewhere in its opinion, that the definition of "marital status" was given divergent treatment in our case law prior to 1993. In Edwards v. Farmers Ins. Co., Ill Wash.2d 710, 719, 763 P.2d 1226 (1988), we specifically adopted the holding of Cybyske v. Independent Sch. Dist. No. 196, 347 N.W.2d 256, 261 (Minn.), cert. denied, 469 U.S. 933, 105 S.Ct. 330, 83 L.Ed.2d 266 (1984), that an employer's refusal to hire because of the views of an applicant's spouse did not constitute marital discrimination because it was not directed at the institution of marriage itself.
This divergence in our case law makes this court's interpretation of "marital status" prior to 1993 ambiguous at best. "Where the statute has not been interpreted to mean something different and where the original enactment was ambiguous to the point that it generated dispute as to what the Legislature intended, a subsequent amendment can enlighten courts as to a statute's original meaning." Ravsten v. Department of Labor & Indus., 108 Wash.2d 143, 150-51, 736 P.2d 265 (1987). Defining "marital status" to mean just what it says, the Legislature clarified the phrase as it was and is meant to be understood in its 1993 amendment. This amendment was meant to clarify an uncertainty rather than change existing law. "Where a former statute is amended, or a doubtful meaning clarified by subsequent legislation a number of courts have held that such amendment or subsequent legislation is strong evidence of legislative intent of the first statute." 2B Norman B. Singer, Sutherland Statutory Construction § 49.11 at 83. See also Cowiche Growers, Inc. v. Bates, 10 Wash.2d 585, 604, 117 P.2d 624 (1941) ("[w]here the legislature has placed its own construction upon a prior enactment, the courts are not at liberty to speculate upon legislative intent."); State ex rel. Oregon R. & N. Co. v. Clausen, 63 Wash. 535, 541, 116 P. 7 (1911) ("Courts are not at liberty to speculate upon legislative intent when that body, having subsequent opportunity, has put its own construction upon prior enactments."). This amendment was a legislative instruction clarifying what that body meant *318 from the beginning. Through this enactment the Legislature merely restated its original intent.

CONCLUSION
This court should refrain from rewriting legislation to reflect personal policy preferences of the individual justices. The decision ignores the plain meaning of words. The majority's decision casts aside the reasoned decision of the people's elected representatives in favor of its own. The majority's decision shows little respect for our Legislature and even less for the people that elected it. For the foregoing reasons, I conclude the trial court properly entered summary judgment in favor of the defendants and therefore dissent.
MADSEN, J., concurs.
NOTES
[1] The parties did not petition for review on any issue but the definition of marital status under RCW 49.60, and our review is confined to that issue. RAP 13.7(b).
[2] Under WAC 162-16-150, an employer may discriminate based on marital status if it is necessitated by "business necessity." WAC 162-16-150 states:

It is also an unfair practice because of sex, where it burdens women much more than men, or men much more than women. However, there are certain circumstances where business necessity may justify action on the basis of what the spouse does, and where this is so the action will be considered to come within the bona fide qualification exception to the general rule of nondiscrimination. "Business necessity" for purposes of this section includes those circumstances where an employer's actions are based upon a compelling and essential need to avoid business-related conflicts of interest, or to avoid the reality or appearance of improper influence or favor.
[3] The broad approach is taken in Thompson v. Board of Trustees, 192 Mont. 266, 627 P.2d 1229 (1981); Kraft, Inc. v. State, 284 N.W.2d 386 (Minn.1979); Ross v. Stouffer Hotel Co. (Hawai`i) Ltd., Inc., 76 Hawai`i 454, 879 P.2d 1037 (1994). A narrow approach, holding anti-nepotism policies are not discriminatory, is taken in Whirlpool Corp. v. Civil Rights Comm'n, 425 Mich. 527, 390 N.W.2d 625 (1986); Manhattan Pizza Hut, Inc. v. Human Rights Appeal Bd., 51 N.Y.2d 506, 415 N.E.2d 950, 434 N.Y.S.2d 961 (1980); Boaden v. Department of Law Enforcement, 267 Ill.App.3d 645, 205 Ill.Dec. 213, 642 N.E.2d 1330 (1994), aff'd, 171 Ill.2d 230, 215 Ill.Dec. 664, 664 N.E.2d 61 (1996). These latter cases confine marital status discrimination to cases where the adverse action is premised solely on marital status as single or married.
[4] We adhere in this case to our clear precedents, rather than "reflecting personal policy preferences of the individual justices," as the dissent imputes. The dissent does not contradict our analysis of Washington Water Power or Kastanis. Perhaps revelatory of a personal preference of an individual justice is the dissent's reference to RICHARD A. EPSTEIN, FORBIDDEN GROUNDS: THE CASE AGAINST EMPLOYMENT DISCRIMINATION LAWS (1992). In his introduction, Professor Epstein states, "employment discrimination laws were an unjustified limitation on the principle of freedom of contract... There is no adequate theoretical foundation or practical justification for the employment discrimination laws." EPSTEIN at xii.
[1] But even this and similar statements of purpose have not escaped criticism, especially in application. See C. Jacob Ladenheim, J.D., "Discrimination" was not always a dirty word, Chiropractic Legal Update, Vol. 7, Issue 1, p. 3 (1996) ("Remember the days when it was considered a compliment to observe that a person had `discriminating tastes?' Those days are no more. Discrimination has become synonymous with closed-mindedness. Racial Bigotry.... College campuses are replete with `politically correct' illogical extensions of non-discrimination litmus tests.... The problem with `social reform' is that it makes good electioneering rhetoric and often allows its proponents to bask in morally superior self-congratulation.").